IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARCHERDX, INC. and THE GENERAL HOSPITAL CORPORATION d/b/a MASSACHUSETTS GENERAL HOSPITAL, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 18-1019-MN |
| QIAGEN SCIENCES, LLC, QIAGEN LLC f/k/a QIAGEN, INC., QIAGEN BEVERLY, LLC f/k/a QIAGEN BEVERLY, INC. QIAGEN GAITHERSBURG, LLC f/k/a QIAGEN GAITHERSBURG, INC., QIAGEN GMBH, QIAGEN N.V. and JONATHAN ARNOLD, | ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | | |

## **AMENDED COMPLAINT**

Plaintiffs ArcherDX, Inc. ("Archer") and The General Hospital Corporation d/b/a

Massachusetts General Hospital ("MGH") file this Amended Complaint and Jury Trial Demand

against Defendants QIAGEN Sciences, LLC, QIAGEN LLC f/k/a QIAGEN Inc., QIAGEN

Beverly, LLC f/k/a QIAGEN Beverly Inc., QIAGEN GAITHERSBURG, LLC f/k/a QIAGEN

Gaithersburg, Inc., QIAGEN GmbH, and QIAGEN N.V. (collectively, "QIAGEN"), and

Jonathan Arnold ("Arnold", and as used collectively with QIAGEN, "Defendants") and allege as

follows:

### **INTRODUCTION**

1.      Plaintiffs bring this Amended Complaint against Defendants to stop Defendants'

unlawful misappropriation of trade secrets, patent infringement, false advertising, breach of

fiduciary duty, and tortious interference with prospective business relations, which have caused and continue to cause irreparable harm to Plaintiffs.  Archer develops, commercializes and sells products utilizing its proprietary Anchored Multiplex PCR ("AMP™") target enrichment technology, which enables the determination of nucleotide sequences, including novel gene fusions and gene fusions found in many cancers.  Some aspects of Archer's technology are patented and others are protected by various trade secrets, including trade secrets relating to preparing a DNA sample for target enrichment.  Defendants misappropriated Archer's trade secrets and are infringing and have infringed Plaintiffs' patents in order to develop and market products that compete with Archer's AMP™ products.  Having unlawfully reaped the fruits of Archer's and MGH's labor, Defendants improperly obtained Archer's top customer list and have targeted the sale of their infringing products to customers on that list, while undercutting Archer's prices and making false and misleading statements about the relationship of Archer and QIAGEN, all of which has caused and continues to cause irreparable harm to Archer and MGH.

## THE PARTIES

2.      Archer is a Delaware corporation having its principal place of business at 2477 55th Street, Suite 202, Boulder, CO 80301.

3.      MGH is a Massachusetts corporation having its principal place of business at 55 Fruit Street, Boston, MA 02114.

4.      On information and belief, QIAGEN Sciences, LLC ("QIAGEN Sciences") is a Delaware corporation having a principal place of business at 19300 Germantown Road, Germantown, MD 20874.  On information and belief, QIAGEN Sciences is a wholly-owned subsidiary of QIAGEN Gaithersburg, Inc.

5.      On information and belief, QIAGEN LLC f/k/a QIAGEN, INC. is a California

2

limited liability corporation having a principal place of business at 19300 Germantown Road, Germantown, MD 20874.  On information and belief, QIAGEN LLC is a wholly-owned subsidiary of either QIAGEN Gaithersburg, LLC f/k/a QIAGEN Gaithersburg, Inc. or QIAGEN NA Holdings, Inc.  On information and belief, QIAGEN LLC was formerly known as QIAGEN, Inc. and converted to a California LLC on or about December 31, 2017.

6.     On information and belief, QIAGEN Beverly, LLC f/k/a QIAGEN Beverly, Inc. ("QIAGEN Beverly") is a Massachusetts limited liability corporation having a principal place of business at 100 Cummings Center, Suite 407J, Beverly, MA 01915.  On information and belief, QIAGEN Beverly, LLC is a successor-in-interest corporation to Enzymatics, Inc.  On information and belief, QIAGEN Beverly, LLC also holds itself out as "Enzymatics is now QIAGEN Custom Solutions" (http://www.enzymatics.com/, last accessed September 15, 2019).

7.     On information and belief, QIAGEN GAITHERSBURG, LLC f/k/a QIAGEN Gaithersburg, Inc. ("QIAGEN Gaithersburg") is a Delaware limited liability corporation having a principal place of business at 19300 Germantown Road, Germantown, MD 20874.

8.     On information and belief, QIAGEN GmbH is a German corporation having a principal place of business at QIAGEN Strasse 1 40724, Hilden, Germany.  On information and belief, QIAGEN GmbH has, both directly and through its subsidiaries, marketed and helped sell QIAGEN-branded products, including the QIAseq and QIAact Kits (defined below), in the United States, including in the District of Delaware, and continues to do so.  Furthermore, QIAGEN GmbH has admitted that it "controls the QIAGEN.com website, which offers product for sale worldwide." *Illumina, Inc. et. al. v. QIAGEN N.V. et al.*, Case No. 16-cv-02788-WHA (N.D.Cal.) (QIAGEN GMBH'S ANSWER TO COMPLAINT FOR PATENT INFRINGEMENT, at paragraph 2).

9.     On information and belief, QIAGEN N.V. is a Dutch corporation having a principal place of business at Hulsterweg 82, 5912 PL Venlo, The Netherlands.  On information and belief, QIAGEN N.V. is the ultimate parent corporation of the family of QIAGEN subsidiaries.  Furthermore, QIAGEN N.V. has admitted that it "is the ultimate parent of a number of subsidiaries in the United States."  *Illumina, Inc. et. al. v. QIAGEN N.V. et al.*, Case No. 16-cv-02788-WHA (N.D.Cal.) (QIAGEN N.V.'s ANSWER TO COMPLAINT FOR PATENT INFRINGEMENT, at paragraph 8).  On information and belief, QIAGEN N.V. is the parent corporation of QIAGEN GmbH.  On information and belief, QIAGEN N.V. has, both directly and through its subsidiaries, marketed and helped sell QIAGEN-branded products, including the QIAseq and QIAact Kits (collectively, "QIAseq kits"), in the United States, including in the District of Delaware, and continues to do so.

10.     On information and belief, Jonathan Arnold is Vice President, Head of Oncology and Precision Diagnostics at QIAGEN.

## JURISDICTION AND VENUE

11.     This action arises under federal law, including the Patent Act, 35 U.S.C. § 101 *et seq.*, the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  This Court has subject matter jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331, 1338, and 1367, 18 U.S.C. § 1836(c) and 15 U.S.C. § 1121(a).  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the following causes of actions: misappropriation of trade secrets pursuant to 6. Del., § 2001 *et seq.*; misappropriation of trade secrets pursuant to Md. Com. Law §§ 11-1201−11-1209; misappropriation of trade secrets pursuant to Mass. Gen. Laws Ann. ch. 93, § 42; breach of fiduciary duty of care and duty of loyalty; aiding and abetting a breach of fiduciary duty; deceptive trade practices pursuant to

Del. Civil Code Title 6, § 2532; Florida's Deceptive and Unfair Trade Practices Act §§ 501.201-.213; California Bus. & Prof. Code §§ 17500, 17500.5, 17505 and 17535; Texas Bus. And Comm. Code Title 2, § 17.01 *et seq*.; and common law tortious interference with prospective business relations.

12.     This Court has personal jurisdiction over Defendants:

a.     QIAGEN Sciences is a Delaware corporation, and therefore subject to this Court's jurisdiction.  On information and belief, QIAGEN Sciences, through or with QIAGEN GmbH, sells and/or offers for sale QIAGEN's infringing products through the website QIAGEN.com throughout the United States, including in Delaware.

b.     QIAGEN Gaithersburg is a Delaware corporation, and therefore subject to this Court's jurisdiction.  Furthermore, QIAGEN Gaithersburg is involved in the research and development and marketing of QIAGEN products.  *Illumina, Inc. et. al. v. QIAGEN N.V. et al*., Case No. 16-cv-02788-WHA (N.D.Cal.) (QIAGEN Gaitherburg's ANSWER TO COMPLAINT FOR PATENT INFRINGEMENT, at paragraph 10).  On information and belief, QIAGEN Gaithersburg, through or with QIAGEN GmbH, sells and/or offers for sale QIAGEN's infringing products through the website QIAGEN.com throughout the United States, including in Delaware.

c.     QIAGEN LLC is subject to personal jurisdiction in Delaware as a result of its tortious acts, identified below, against Archer, a Delaware corporation.  Furthermore, QIAGEN LLC is registered to do business in Delaware.  On information and belief, QIAGEN LLC, through or with

QIAGEN GmbH, sells and/or offers for sale QIAGEN's infringing products through the website QIAGEN.com throughout the United States, including in Delaware.

d.   QIAGEN Beverly is subject to personal jurisdiction in Delaware as a result of its tortious acts, identified below, against Archer, a Delaware corporation.  On information and belief, QIAGEN Beverly, through or with QIAGEN GmbH, sells and/or offers for sale QIAGEN's infringing products through the website QIAGEN.com throughout the United States, including in Delaware.

e.   QIAGEN GmbH is subject to personal jurisdiction in Delaware as a result of its tortious acts, identified below, against Archer, a Delaware corporation.  On information and belief, QIAGEN GmbH sells and/or offers for sale QIAGEN's infringing products through the website QIAGEN.com throughout the United States, including in Delaware.  Alternatively, QIAGEN GmbH is subject to personal jurisdiction under Fed. R. Civ. P. 4(k)(2).

f.   QIAGEN N.V. is subject to personal jurisdiction in Delaware as a result of its tortious acts, identified below, against Archer, a Delaware corporation.  Alternatively, QIAGEN N.V. is subject to personal jurisdiction under Fed. R. Civ. P. 4(k)(2).   On information and belief, QIAGEN N.V., through QIAGEN GmbH, sells and/or offers for sale QIAGEN's infringing products through the website QIAGEN.com throughout the United States, including in Delaware.

g.  Arnold served on the Board of Directors of Archer and is therefore subject to personal jurisdiction in Delaware pursuant to Del. Civil Code Title 10, § 3114(b).

13.  Alternatively, this Court has general and/or specific personal jurisdiction over all Defendants because Defendants are members of a conspiracy to defraud Plaintiffs, a substantial act or substantial effect in furtherance of the conspiracy occurred in this District, the Defendants knew or had reason to know of the acts in this District or that acts outside this District would have an effect in this District, and the acts in, or effects on, this District were a direct and foreseeable result of the conduct in furtherance of the conspiracy.  As set forth in more detail in the allegations that follow, Defendants have conspired to harm and defraud Plaintiffs, including through commission of acts of patent infringement, misappropriation of trade secrets, and false advertising under the Lanham Act in this District, and/or have harmed and continue to harm Plaintiffs in this District by, among other things, using, selling, offering for sale in and/or importing into this District infringing products and services, and by committing tortious acts in this District, including acts under the Defend Trade Secrets Act and the Lanham Act, deceptive trade practices, breach of fiduciary duties and tortious interference with prospective business relations.  Defendants have directed into Delaware QIAGEN products that infringe the '810 Patent and the '597 Patent (collectively referred to/as the "Patents"), including but not limited to, QIAGEN's QIAseq Kits, and have committed tortious acts against Archer, a Delaware corporation (including acts under the Defend Trade Secrets Act and the Lanham Act, deceptive trade practices, breach of fiduciary duties, and tortious interference with prospective business relations).  On information and belief, QIAGEN continues to import into, and market and sell within Delaware and elsewhere in the United States, the QIAseq GEN Kits.  Defendants thus

7

engaged in conduct in furtherance of a conspiracy to harm Plaintiffs, knowing of, or having reason to know of, wrongful acts that occurred in Delaware or had effects in Delaware, which acts or effects were direct and foreseeable results of Defendants' conduct.

14.     Alternatively, this Court has general and/or specific personal jurisdiction over all Defendants because pursuant to the facts below, Defendants are alter-egos of one another and/or agents of QIAGEN Sciences and QIAGEN Gaithersburg and, as such, have conducted and continue to conduct substantial business in this District, have committed and continue to commit acts of patent infringement, misappropriation of trade secrets, false advertising under the Lanham Act, breach of fiduciary duty of care and duty of loyalty, aiding and abetting a breach of fiduciary duty, deceptive trade practices and common law tortious interference with prospective business relations in this District, and/or have harmed and continue to harm Plaintiffs in this District by their tortious acts.  On information and belief, Defendants have purposefully availed themselves of the benefits of Delaware's laws and of the privilege of conducting business in Delaware by directing into Delaware QIAGEN products that infringe the Patents, including but not limited to QIAGEN's QIAseq Kits, and by committing tortious acts against Archer, a Delaware corporation (including acts under the Defend Trade Secrets Act, the Lanham Act, deceptive trade practices, breaches of fiduciary duties, and tortious interference with prospective business relations).  On information and belief, QIAGEN is continuing to import into, and market and sell within, Delaware and elsewhere in the United States, the QIAseq Kits.  As a result of Defendants' intentional conduct directed towards Delaware, Plaintiffs have suffered injury in Delaware and elsewhere.

15.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b).

16.     Venue is proper in this District for claims arising under the Defend Trade Secrets Act, Lanham Act, state statutes regarding misappropriation of trade secrets, deceptive trade practices and breach of fiduciary duties, and the common law of tortious interference, because a substantial part of the events or omissions giving rise to the claim occurred in this District.  In the alternative, venue is proper in this District because there is no district in which an action may otherwise be brought, and because at least one Defendant is subject to personal jurisdiction in this District.  In addition, pendent venue exists for this Court to hear the state and common law claims as they arise out of the same nucleus of operative facts as the federal claims.

17.     Venue is also proper with respect to the patent infringement claims pursuant to 28 U.S.C. § 1400(b).  On information and belief, QIAGEN Sciences and QIAGEN Gaithersburg reside in this District, and therefore meet the requirements of 28 U.S.C § 1400(b). Furthermore, venue is proper pursuant to 28 U.S.C. § 1391(c) in any District, including the District of Delaware, for the foreign entities QIAGEN GmbH and QIAGEN N.V.  Pendent venue exists for the patent infringement claims against QIAGEN LLC because that claim arises out of the same nucleus of operative facts as the other federal claims.

## HISTORY AND THE PATENTS-IN-SUIT

### A.     Plaintiffs' Patented Anchored Multiplex PCR Technology

18.     The Patents-in-Suit

a.      On July 10, 2018, U.S. Patent No. 10,017,810 ("the '810 Patent"), entitled METHODS FOR DETERMINING A NUCLEOTIDE SEQUENCE CONTIGUOUS TO A KNOWN TARGET NUCLEOTIDE SEQUENCE, was issued to Anthony John Iafrate, Long Phi Le and Zongli Zheng and assigned to

MGH.  The '810 Patent is directed to methods of determining oligonucleotide sequences, e.g., by enriching target sequences prior to sequencing.  A true and correct copy of the '810 Patent is attached to this Amended Complaint as Exhibit 1 and is incorporated by reference herein.  Archer is the exclusive licensee of the '810 Patent in the fields of non-clinical laboratory research and in vitro diagnostics.

b.  On October 22, 2019, U.S. Patent No. 10,450,597 ("the '597 Patent"), entitled METHODS OF PREPARING NUCLEIC ACIDS FOR SEQUENCING, was issued to Anthony John Iafrate, Long Phi Le, Zongli Zhen, Jason Myers, and Joshua Stahl and assigned to MGH and Archer.  The '597 Patent is directed to methods of preparing and analyzing nucleic acids, e.g., by enriching target sequences prior to sequencing.  A true and correct copy of the '597 Patent is attached to this Amended Complaint as Exhibit 2 and is incorporated by reference herein.  Archer is the co-owner of the '597 Patent.

19.  Archer was originally founded in 2013.  Archer develops, commercializes and sells products utilizing its proprietary AMP™ technology, a target enrichment chemistry developed to create target-enriched libraries for next generation sequencing ("NGS").  AMP™ chemistry is flexible, so it can be used for applications in targeted RNA sequencing, DNA sequencing and various genotyping applications.  Archer's AMP™ technology enables the determination of nucleotide sequences, including novel gene fusions and gene fusions found in many cancers, and has many research and clinical applications.  Certain aspects of Archer's AMP™ technology are patented and covered by the Patents.

20.     Archer sells various products within four product lines that utilize Archer's AMP™ technology:  VariantPlex®, FusionPlex®, Reveal ctDNA™, and Immunoverse™.  The products are sold in assay "kits" that include primers, easy-to-handle lyophilized master mixes, and platform-specific reagents to generate targeted libraries ready for sequencing.  Archer's products may be used in research and laboratory developed tests ("LDT") for the detection of genes involved in cancer, and Archer sells standardized kits directed to certain disease segments. For example, Archer® FusionPlex® Solid Tumor Kit is a robust targeted sequencing assay to simultaneously detect and identify fusions and other mutations associated with over 50 genes linked to various types of cancer.  As another example, the Archer® FusionPlex® Comprehensive Thyroid and Lung (CTL) Kit is a targeted NGS panel to detect gene fusions, single nucleotide variants, insertions/deletions, splicing and gene expression in 36 genes associated with lung and thyroid cancers.  In addition to its standardized kits encompassing AMP™ technology, Archer also sells custom kits specifically designed to meet the needs of a particular customer.  For example, Archer® VariantPlex® kits for inherited diseases are highly customizable assays that deliver comprehensive coverage of target exons for genes associated with breast cancer risk (BRCA 1/2 & PALB2), cystic fibrosis (CFTR), and many other indications a customer may request.  The VariantPlex®, FusionPlex®, Reveal ctDNA™, and Immunoverse™ products, including custom kits, are sold as "research use only" products to customers, including researchers, clinical laboratories, contract research organizations, and pharmaceutical and biotechnology companies (collectively, "End-users").

**B.     The Contractual Relationship Between Archer and QIAGEN**

21.     In 2013, Archer began developing enzyme-based DNA fragmentation technology, including unique, proprietary enzyme mixtures used for DNA fragmentation to create a library

for sequencing.  In 2013, Archer entered into a license with MGH for MGH technology and

patent applications (including the application that issued as the '810 Patent and the '597 Patent)

("MGH License").  Archer developed its commercialized AMP™ kits by leveraging MGH's

technology for NGS using targeted enrichment and utilizing Archer's proprietary enzyme-based

DNA fragmentation technology.

22.     In August 2013, Archer was acquired by Massachusetts-based Enzymatics, Inc.

("Enzymatics").  Enzymatics was a supplier of enzymes used in NGS and other genetic analysis

technologies in life sciences research and clinical applications.  On information and belief,

Enzymatics acquired Archer to leverage Archer's expertise in NGS.  After Enzymatics acquired

Archer, Archer operated as a business unit of Enzymatics.  During this time, Archer continued its

research and development of its proprietary enzyme-based DNA fragmentation technology and

AMP™ technology, leading to the launch of Archer's first AMP™ kit in 2014.  Using Archer's

proprietary formulations and recipes, Enzymatics supplied the enzymes and reagents for use in

Archer's AMP™ kits, assembled Archer's AMP™ kits, and conducted quality control of

Archer's AMP™ reagents and kits.  This supply and quality control work was done by

Enzymatics in Beverly, Massachusetts.  By virtue of Archer's operation as a business unit of

Enzymatics, Enzymatics had access to Archer's technology.

23.     In 2014, QIAGEN acquired Enzymatics.  In the transaction by which QIAGEN

acquired Enzymatics, Archer was spun-off as an independent company and was not acquired by

QIAGEN ("Transaction").  As a result of the Transaction, Enzymatics became a wholly-owned

subsidiary within the QIAGEN family and Archer again became an independent corporation.

24.     As part of the Transaction, Enzymatics and Archer entered into a series of agreements whereby Enzymatics agreed to transfer to Archer, among other things, the MGH License and proprietary information related to Archer products and reagents.

25.     Pursuant to agreements among the parties, QIAGEN Beverly and QIAGEN LLC had confidential access to certain of Archer's trade secrets.  No Transaction agreement permitted or permits any QIAGEN entity to use Archer's trade secrets, including information relating to Archer's enzyme-based DNA fragmentation technology, for use to create a whole genome library that is further processed to create a library that is enriched for specific targets or target sequences.

26.     As part of the Transaction, Archer and QIAGEN LLC agreed to collaborate to develop new products for QIAGEN's sequencing instrument called "GeneReader".

27.     Also as part of the Transaction, QIAGEN was entitled to have an employee of QIAGEN sit on Archer's Board of Directors.  On or about October 2015, QIAGEN-employee Arnold, currently the Head of Partnering for Precision Diagnostics and Oncology, and formerly the Senior Director Marketing for Next-Generation Sequencing, was appointed a director on Archer's Board of Directors as QIAGEN's board representative.  Arnold, as a director of Archer, owed a fiduciary duty of care and duty of loyalty to Archer.

**QIAGEN DEVELOPS A COMPETING PRODUCT USING ARCHER'S TECHNOLOGY**

28.     Following the Transaction, Archer sought to assist QIAGEN with the development of kits leveraging Archer's AMP™ technology for use on QIAGEN's "GeneReader".

29.     After an analysis of QIAGEN's GeneReader instrument, Archer concluded that it did not meet the technical specifications for Archer's AMP™ technology, and, in or around

September 2015, advised QIAGEN and Arnold of the steps QIAGEN would have to undertake to bring the GeneReader in line with the technical requirements necessary for use of Archer's AMP™ technology.

30.     The relationship between QIAGEN and Archer became strained after Archer informed QIAGEN that QIAGEN's GeneReader instrument was inadequate to operate Archer's AMP™ technology.

31.     The parties discussed how Archer could develop AMP™ assays for use on the existing GeneReader instrument, and Archer provided QIAGEN with a cost estimate for such development.

32.     QIAGEN, through at least Arnold, after insisting that Archer should receive only a fraction of its costs for such development, rejected Archer's proposal.

33.     QIAGEN, through at least Arnold, instead proposed that QIAGEN become a distributor of Archer's existing AMP™ products which were sold for use on other sequencing platforms, such as instruments sold by Illumina, Inc. and ION Torrent Systems, Inc.

34.     While Archer and QIAGEN discussed the terms of a distributorship, Archer began confidentiality educating QIAGEN employees, including QIAGEN salespeople, about the use of AMP™ on these other platforms.

35.     The parties could not agree on terms, and by 2016 all discussions regarding potential development of new products for QIAGEN's GeneReader instrument and QIAGEN's distribution of Archer's existing products ended.

36.     On information and belief, at least as of December 2014, due to the relationship between the parties, QIAGEN was privy to intricate knowledge regarding how Archer's AMP™ kits (including their components) are made and used, including Archer's patented AMP™

technology and Archer's trade secrets (*e.g.*, information and know-how related to its enzyme-based DNA fragmentation technology and non-patented aspects of its AMP™ technology)("Archer Trade Secrets").  Furthermore, Enzymatics (now QIAGEN Beverly) had been in possession of how to make and use Archer's AMP™ kits (including their components), including its patented AMP™ technology and Archer Trade Secrets, dating back to when Archer was a division of Enzymatics.  Armed with this knowledge, QIAGEN and Arnold set out to develop competing NGS kits and, in doing so, misappropriated Archer Trade Secrets, have infringed and are infringing the Patents, and set out to intentionally mislead Archer's End-users regarding QIAGEN's relationship with Archer, thereby substantially harming Archer and MGH.

37.     The QIAseq Kits

a.     On information and belief, in the Fall of 2016, QIAGEN released its QIAseq Kits, which incorporate Archer's patented AMP™ technology and Archer Trade Secrets.  QIAGEN sells these kits under the umbrella title of QIAseq NGS Solutions, which it markets as providing "[r]eliable nucleic acid purification from any sample material, high-quality, target-enriched samples and streamlined library preparation procedures, together with market-leading data analysis and interpretation tools, ensure focused and accurate results."  *See* https://www.qiagen.com/us/products/ngs/ngs-life-sciences/, last accessed July 10, 2018.  As a non-limiting example, the QIAseq Kits include any product sold by QIAGEN with the "QIAseq" name and/or any QIAGEN product (whether termed under the umbrella name "QIAseq" or another term to be determined during discovery) developed with or using Archer's AMP™ technology and/or Archer Trade Secrets (the "QIAseq Kits").  These products

15

include, but are not limited to: QIAseq Targeted DNA Panels, QIAseq
Targeted RNAscan Panels, QIAseq Index Kits, and QIAseq Immune
Repertoire RNA Library Kits.  *See, e.g.,*
https://www.qiagen.com/us/products/ngs/ngs-life-sciences/;
https://www.qiagen.com/us/shop//sequencing/qiaseq-targeted-dna-
panels/#orderinginformation; https://www.qiagen.com/us/shop/sample-
technologies/rna/qiaseq-targeted-rnascan-panel/#orderinginformation;
https://www.qiagen.com/us/shop/sample-technologies/rna/qiaseq-
indexes/#orderinginformation; https://www.qiagen.com/us/shop/sample-
technologies/rna/qiaseq-immune-repertoire-rna-library-
kits/#orderinginformation, last accessed September 15, 2019.

b.  On information and belief, in the Summer of 2018, QIAGEN released its Gene
Read QIAact Kits, which incorporate Archer's patented AMP™ technology
and Archer Trade Secrets.  QIAGEN sells these kits under the umbrella title of
GeneReader NGS System.  As a non-limiting example, the QIAseq Kits
include any product sold by QIAGEN with the "QIAact" name and/or any
QIAGEN product (whether termed under the umbrella name "QIAact" or
another term to be determined during discovery) developed with or using
Archer's AMP™ technology and/or Archer Trade Secrets (the "QIAact Kits").
These products include, but are not limited to: GeneRead QIAact BRCA 1/2
Panel, GeneRead QIAact AIT DNA UMI Panel, GeneRead QIAact BRCA
Advanced DNA UMI Panel, GeneRead QIAact Lung UMI Panel, GeneRead
QIAact Myeloid DNA UMI Panel, and GeneRead QIAact Custom Panels.  *See,*

*e.g.,* https://www.qiagen.com/us/products/instruments-and-automation/genereader-system/; https://www.qiagen.com/us/products/next-generation-sequencing/dna-sequencing/germline-panels/generead-qiaact-brca12-panel-ww/#orderinginformation;

https://www.qiagen.com/us/products/next-generation-sequencing/dna-sequencing/somatic-panels/generead-qiaact-ait-dna-umi-panel/#orderinginformation;

https://www.qiagen.com/us/shop/sequencing/generead-qiaact-brca-advanced-dna-umi-panel-ww/; https://www.qiagen.com/us/products/next-generation-sequencing/dna-sequencing/somatic-panels/generead-qiaact-lung-panels-ww/#orderinginformation; https://www.qiagen.com/us/products/next-generation-sequencing/genereader-system/qiaact-myeloid-dna-umi-panel/#orderinginformation; https://www.qiagen.com/us/products/next-generation-sequencing/custom-ngs-panels/generead-qiaact-custom-panels-ww/#orderinginformation, last accessed September 15, 2019.

## QIAGEN'S UNLAWFUL ACTIVITY AGAINST ARCHER

**A.    QIAGEN Misappropriated Archer Trade Secrets**

38.    QIAGEN was in possession of Archer Trade Secrets, at least because: (1) Enzymatics, Inc. (predecessor-in-interest of QIAGEN Beverly) was in possession of such trade secrets prior to its acquisition by QIAGEN and (2) Archer shared such information and trade secrets with QIAGEN for certain limited purposes, including for QIAGEN to perform services for Archer.  However, QIAGEN was not permitted to use Archer Trade Secrets for its own competing QIAseq Kits.

39.     On information and belief, QIAGEN sells numerous QIAseq Kits that use Archer Trade Secrets.

40.     On information and belief, QIAGEN sales representatives have informed and continue to inform End-users that the QIAseq Kits utilize "the same technology" as that used in AMP™ kits.  On information and belief, QIAGEN sales representatives have made and continue to make this statement with the knowledge, and at the direction, of QIAGEN.

**B.      The QIAseq Kits Infringe The Patents**

41.     On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. offer to sell and sell numerous QIAseq Kits. As further explained below, the use of these kits by End-users in the United States in accordance with the instructions provided to them by QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V directly infringes claimed methods of the Patents.  QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. induce and/or contribute to the infringement of the Patents by selling and offering for sale the QIAseq Kits and instructing End-users to conduct infringing methods.  QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. instruct End-users to conduct infringing methods, at least, by including with their QIAseq Kits instructions to use the kits.

42.     On information and belief, the packaging of the QIAseq Kits bears the name of "QIAGEN Sciences."  Furthermore, the QIAGEN.com website indicates that QIAGEN LLC is a sales arm of QIAGEN in the United States.  https://www.qiagen.com/us/shop/ordering-information/ordering-terms-usa/#conditions, last accessed July 10, 2018 (stating "Ordering from QIAGEN Inc[]" and providing contact information to QIAGEN LLC's Maryland office).  On

information and belief, QIAGEN GmbH operates the QIAGEN.com website, which offers for sale and sells the QIAseq Kits.  On information and belief, QIAGEN Gaithersburg is involved in the research and development of components/reagents in the QIAseq Kits.  Furthermore, on information and belief, as ultimate parent to these subsidiaries, QIAGEN N.V. is directly involved in, responsible for, and benefits from the sale of these products.

43.     QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. marketing materials are publicly available and provide depictions of various workflows (instructions for use) of the QIAseq Kits, including workflows for both RNA and DNA panels, such as those shown below:



(https://www.qiagen.com/us/shop/sequencing/qiaseq-solutions/qiaseq-targeted-dna-panels/#productdetails, last accessed July 10, 2018; https://www.qiagen.com/us/shop/sample-technologies/rna/qiaseq-targeted-rnascan-panel/#productdetails; https://www.qiagen.com/us/shop/sample-technologies/rna/qiaseq-immune-repertoire-rna-library-kits/#productdetails, last accessed July 10, 2018).

44.    On information and belief, the QIAseq Kits are sold with instructions to End-users to perform the steps identified in the above workflows.  The use of the QIAseq Kits according to these instructions and workflows, and according to QIAGEN Sciences', QIAGEN LLC's, QIAGEN Gaithersburg's, QIAGEN GmbH's, and QIAGEN N.V.'s instructional materials, product manuals and technical materials, and promotional/marketing materials that describe the workflows and operational use of the QIAseq Kits, directly infringes at least claims 1 and 16 of the '810 Patent.  Claim 16 is recited below:

> A method for preparing a nucleic acid for sequencing, the method comprising: (i) ligating a universal oligonucleotide tail adaptor that comprises a first ligatable duplex end and a second unpaired end to a nucleic acid comprising a known target nucleotide sequence to produce a ligation product, the universal oligonucleotide tail adaptor comprising an amplification strand and a blocking strand, wherein a 3' duplex portion of the amplification strand and a 5' duplex portion of the blocking strand are substantially complementary and form the first ligatable duplex end; (ii) amplifying the ligation product using a first target-specific primer that specifically anneals to the known target nucleotide sequence and a first adaptor primer having a nucleotide sequence identical to a first portion of the amplification strand; and (iii) amplifying an amplification product of (ii) using a second target-specific primer that specifically anneals to the amplification product of (ii) and a second adaptor primer having a nucleotide sequence identical to a second portion of the amplification strand, wherein ligating in step (i) comprises performing an overhang ligation reaction, and wherein the universal oligonucleotide tail adaptor further comprises a barcode portion.

45.    On information and belief, the QIAseq Kits are sold with instructions to End-users to perform the steps identified in the above workflows.  The use of the QIAseq Kits according to these instructions and workflows, and according to QIAGEN Sciences', QIAGEN LLC's, QIAGEN Gaithersburg's, QIAGEN GmbH's, and QIAGEN N.V.'s instructional materials, product manuals and technical materials, and promotional/marketing materials that

describe the workflows and operational use of the QIAseq Kits, directly infringes at least claim 1

of the '597 Patent.  Claim 1 is recited below:

> A method of preparing nucleic acids for analysis, the method comprising: (a) contacting a first nucleic acid template comprising a sequence of a first strand of a double-stranded target nucleic acid with a complementary target-specific primer that comprises a target-specific hybridization sequence, under conditions to promote template-specific hybridization and extension of the target-specific primer; (b) contacting a second nucleic acid template comprising a sequence of a second strand that is complementary to the sequence of the first strand of the double-stranded target nucleic acid with a plurality of different primers that share a common sequence that is 5' to different hybridization sequences, under conditions to promote template-specific hybridization and extension of at least one of the plurality of different primers, wherein the different hybridization sequences have different 3' ends, and wherein each primer of the plurality of different primers does not anneal to the same sequence of double-stranded target nucleic acids as any other primer of the plurality of different primers, wherein, following (a) and (b), an extension product is generated to contain both a sequence that is characteristic of the target-specific primer and a sequence that is characteristic of the at least one of the plurality of different primers; and (c) subjecting the extension product to an amplification reaction comprising successive rounds of polymerase extension of i) a tail primer that comprises a 3' sequence that specifically anneals to the complement of the common sequence and that comprises a 5' tail sequence, and ii) a primer that specifically anneals to the complement of the target-specific hybridization sequence.

46.     Infringement of the '810 Patent

    a.     On information and belief, the QIAseq Kits are used in methods for

preparing a nucleic acid for sequencing, as recited in at least claim 16 of the

'810 Patent.  To the extent the preamble is considered a limitation of the

claim, the QIAseq Kits meet this element when used in accordance with the

workflow and associated instructions (including those instructions contained

within the QIAseq Kits).  For example, a brochure, dated April 2017, states

that "QIAGEN has developed the broadest portfolio of dedicated NGS

target enrichment, library preparation and single cell solutions: the QIAseq

product family!"  Exhibit 3 at 2.  QIAGEN Sciences, QIAGEN LLC,

QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. further

advertise the QIAseq Kits as:

Enriching nucleic acids for specific genes of interest in targeted panels presents a cost-effective way to democratize NGS while keeping the complexity of data analysis and interpretation at a manageable level.

QIAseq targeted panels combine the advantages of target enrichment with advanced technical solutions to overcome biases:

- Leverage digital NGS through unique molecular indices (UMIs) to detect low-frequency variants with unmatched confidence and significantly reduce false positives.
- Avoid issues of PCR duplicates and library bias through single primer extension.
- Interrogate disease genes, quantify gene expression and detect known or novel fusion genes.

*Id.* at 6.

    b.    On information and belief, the QIAseq Kits are used in methods for

preparing a nucleic acid for sequencing that involves "(i) ligating a universal

oligonucleotide tail adaptor that comprises a first ligatable duplex end and a

second unpaired end to a nucleic acid comprising a known target nucleotide

sequence to produce a ligation product, the universal oligonucleotide tail

adaptor comprising an amplification strand and a blocking strand, wherein a

3' duplex portion of the amplification strand and a 5' duplex portion of the

blocking strand are substantially complementary and form the first ligatable

duplex end" as recited in at least claim 16 of the '810 Patent.  QIAGEN

Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and

QIAGEN N.V. instruct End-users to perform this claim element in, at least,

the following aspect of QIAseq's workflow and associated instructions

(including those instructions contained within the QIAseq Kits):

22



c.     On information and belief, QIAseq Kits are used in methods for preparing a

nucleic acid for sequencing that involves "(ii) amplifying the ligation

product using a first target-specific primer that specifically anneals to the

known target nucleotide sequence and a first adaptor primer having a

nucleotide sequence identical to a first portion of the amplification strand"

as recited in at least claim 16 of the '810 Patent.  QIAGEN Sciences,

QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V.

instruct End-users to perform this claim element in, at least, the following

aspect of QIAseq's workflow and associated instructions (including those

instructions contained within the QIAseq Kits):



d.     On information and belief, QIAseq Kits are used in methods for preparing a

nucleic acid for sequencing that involves "(iii) amplifying an amplification

product of (ii) using a second target-specific primer that specifically anneals

to the amplification product of (ii) and a second adaptor primer having a

nucleotide sequence identical to a second portion of the amplification strand,

wherein ligating in step (i) comprises performing an overhang ligation reaction, and wherein the universal oligonucleotide tail adaptor further comprises a barcode portion" as recited in at least claim 16 of the '810 Patent (see also the image at the end of paragraph 46 above).  QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. instruct End-users to perform this claim element in, at least, the following aspect of QIAseq's workflow and associated instructions (including those instructions contained within the QIAseq Kits):



47.     Infringement of the '597 Patent:

a.     On information and belief, the QIAseq Kits are used in methods for preparing nucleic acids for analysis, as recited in at least claim 1 of the '597 Patent.  To the extent the preamble is considered a limitation of the claim, the QIAseq Kits meet this element when used in accordance with the workflow and associated instructions (including those instructions contained within the QIAseq Kits).  For example, a brochure, dated April 2017, states that "QIAGEN has developed the broadest portfolio of dedicated NGS target enrichment, library preparation and single cell solutions: the QIAseq product family!"  Exhibit 3 at 2.  QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. further describe the QIAseq Kits as:

## Workflow

Isolated RNA, as low as 20 ng, is converted to cDNA. This is followed by the library construction step, in which IL-N7 adapters, molecular barcodes, and sample indexes are incorporated into DNA fragments generated in the previous step. Library fragments now serve as templates for target enrichment using single primer extension. In this step, targets are enriched using a single gene-specific primer and a universal forward primer. The final step is library amplification and sample indexing (for dual indexing) using the IL-S5 sample index primer and a universal primer.

(https://www.qiagen.com/us/products/next-generation-sequencing/rna-sequencing/rna-fusions/qiaseq-targeted-rnascan-panel/#productdetails, last accessed October 21, 2019).

b.    On information and belief, the QIAseq Kits are used in methods for preparing nucleic acids for analysis that involve "(a) contacting a first nucleic acid template comprising a sequence of a first strand of a double-stranded target nucleic acid with a complementary target-specific primer that comprises a target-specific primer that comprises a target-specific hybridization sequence, under conditions to promote template-specific hybridization and extension of the target-specific primer" as recited in at least claim 1 of the '597 Patent.  QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. instruct End-users to perform this claim element in, at least, the following aspect of QIAGEN's workflow and associated instructions (including those instructions contained within the QIAseq Kits):



c.   On information and belief, QIAseq Kits are used in methods for preparing a nucleic acid for sequencing that involves "(b) contacting a second nucleic acid template comprising a sequence of a second strand that is complementary to the sequence of the first strand of the double-stranded target nucleic acid with a plurality of different primers that share a common sequence that is 5' to different hybridization sequences, under conditions to promote template-specific hybridization and extension of at least one of the plurality of different primers, wherein the different hybridization sequences have different 3' ends, and wherein each primer of the plurality of different primers does not anneal to the same sequence of the double-stranded target nucleic acid as any other primer of the plurality of different primers, wherein, following (a) and (b), an extension product is generated to contain both a sequence that is characteristic of the target-specific primer and a sequence that is characteristic of the at least one of the plurality of different primers" as recited in at least claim 1 of the '597 Patent.  QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. instruct End-users to perform this claim element in, at least, the following

aspect of QIAseq kits' workflow and associated instructions (including

those instructions contained within the QIAseq Kits):



d.  On information and belief, QIAseq Kits are used in methods for preparing a

nucleic acid for sequencing that involves "(c) subjecting the extension product to

an amplification reaction comprising successive rounds of polymerase extension

of i) a tail primer that comprises a 3' sequence that specifically anneals to the

complement of the common sequence and that comprises a 5' tail sequence, and

ii) a primer that specifically anneals to the complement of the target-specific

hybridization sequence" as recited in at least claim 1 of the '597 Patent.

QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH,

and QIAGEN N.V. instruct End-users to perform this claim element in, at least,

the following aspect of QIAseq's workflow and associated instructions

(including those instructions contained within the QIAseq Kits):



48.     On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN

Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. conduct research, development, training,

and/or testing activities relating to the launch, marketing and sale of the QIAseq Kits, which uses directly infringe the Patents, and for which no safe harbor applies.  On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. also directly infringe the Patents by using the QIAseq Kits in the United States when they instruct and train End-users on the use of QIAseq Kits at locations throughout the United States.

49.      On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have induced and continue to induce infringement of the Patents.   QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. sell the QIAseq Kits with instructions to End-users to perform the steps identified in the above workflows.  Furthermore, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. distribute instructional materials, product manuals and technical materials, and disseminate promotional/marketing materials, that describe the workflows and otherwise instruct End-users to use the QIAseq Kits to infringe at least claims 1 and 16 of the '810 Patent and claim 1 of the '597 Patent.  QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. sell and offer for sale the QIAseq Kits with the knowledge and specific intent that their instructions and workflows will cause End-users to use the kits to infringe at least claims 1 and 16 of the '810 Patent and claim 1 of the '597 Patent.

50.      On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have contributed to and continue to contribute to the infringement of the  Patents because they offer to sell or sell within the United States or import into the United States the QIAseq Kits for use by End-users in practicing the

patented process of the Patents.  The QIAseq Kits constitute a material part of the invention of

the Patents, and QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH,

and QIAGEN N.V know the QIAseq Kits to be especially made or especially adapted for use in

infringing the  Patents.  Furthermore, the QIAseq Kits are not a staple article or commodity of

commerce suitable for substantial noninfringing use.   QIAGEN Sciences, QIAGEN LLC,

QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. sell and offer for sale the QIAseq

Kits with the knowledge and specific intent that their instructions and workflows will cause

End-users to use the kits to infringe at least claims 1 and 16 of the '810 Patent and claim 1 of

the '597 Patent.

51.     On information and belief, End-users that use the QIAseq Kits in accordance

with the instructions contained within the QIAseq Kits and/or instructional materials, product

manuals and technical materials, and promotional/marketing material, that describe the

workflows provided by QIAGEN Sciences QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN

GmbH, and QIAGEN N.V. directly infringe at least claims 1 and 16 of the '810 Patent and

claim 1 of the '597 Patent.

52.     As set forth below, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg,

QIAGEN GmbH, and QIAGEN N.V. are and have been on notice of the Patents.  On

information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN

GmbH, and QIAGEN N.V. have been aware of the '810 Patent through their due diligence

related to the Transaction and have knowledge of the MGH License, at least because their

predecessor, Enzymatics, was a party to that license following its acquisition of Archer and

before Archer's subsequent spin-off, the MGH License was transferred back to Archer in the

Transaction, and the '810 Patent issued from a patent application in the same family that is

subject to, and specifically identified in, the MGH License.  Thus, on information and belief,

QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN

N.V. were aware of patent applications in the family of the '810 Patent, and QIAGEN Sciences,

QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. would have been

aware of the application and the allowed claims that issued as the '810 Patent.  On  information

and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and

QIAGEN N.V. have been aware of the '597 Patent through their due diligence related to the

Transaction.

53.     On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN

Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. had actual notice of the published claims

of U.S. Patent Application Publication No. 2017-0226575 A1 ("the '575 Publication"),

published August 10, 2017.  On information and belief, QIAGEN Sciences, QIAGEN LLC,

QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. had actual notice of the claims

in the '575 Publication, because Archer and QIAGEN entities were involved in due

diligence negotiations related to the Transaction.  Such due diligence included the MGH

License, and the MGH License is referenced in a Transaction document, and the '575

Publication published from a patent application in the same family that is subject to, and

specifically identified in, the MGH License.  Thus, on information and belief, QIAGEN

Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. had

actual notice of such published patent applications, and QIAGEN Sciences, QIAGEN LLC,

QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V., as a practice, would have been

aware of and have had actual knowledge of the '575 Publication.

54.     QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. are and have been on actual notice of the published claims of U.S. Patent Application No. 14/605,363 ("the '363 Application"), which thereafter issued as the '597 Patent.  On September 10, 2019, counsel for Archer informed QIAGEN of the '597 Patent's pending issuance and attached a copy of the allowed claims of the corresponding '363 Application.

55.     QIAGEN Sciences', QIAGEN LLC's, QIAGEN Gaithersburg's, QIAGEN GmbH's, and QIAGEN N.V's infringement of the Patents has injured and continues to injure Archer, causing irreparable harm, such that a permanent injunction should be issued enjoining QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V., their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns, and all those in active concert and participation with any of the foregoing persons or entities from infringing, inducing the infringement of, or contributing to the infringement of the Patents should be issued and an award to Archer of its damages in an amount to be proven at trial, such damages comprising at least its lost profits and damages incurred for price erosion of Archer's kits, but in no event less than a reasonable royalty.

**C.     QIAGEN's False And Misleading Sales Campaign Of Its QIAseq Kits**

56.     In addition to infringing Archer's Patents and misappropriating Archer Trade Secrets, QIAGEN has attempted to trade on the proven track record of Archer's AMP™ technology by improperly making false statements to Archer and/or QIAGEN End-users or potential End-users in an attempt to steal business away from Archer and harm Archer's reputation in the industry.

31

57.     A substantial aspect of QIAGEN's advertising and promotion for the QIAseq Kits includes face-to-face visits by QIAGEN sales representatives to End-users or potential End-users.  Because many of the technical details of sequencing kits such as the reagents (*e.g.*, enzyme mixtures) are generally kept as trade secrets by companies, End-users rely on sales representatives for accurate representations regarding the source and reliability of the sequencing kits.  It is thus critical that the information that sales representatives convey to End-users be accurate and reliable.

58.     On information and belief, QIAGEN sales representatives have provided false statements to End-users and potential End-users of Archer in an attempt to steal Archer's business.  On information and belief, these false statements have occurred or caused injury in, at least, Delaware, Florida, California, and Texas.  An example of the false statements QIAGEN sales representatives have made include:

- Informing Archer and/or QIAGEN End-users that QIAGEN "owns Archer" when, in fact, QIAGEN does not own Archer; and

- Informing Archer and/or QIAGEN End-users that QIAGEN "has a license" to and/or freedom to operate with respect to Archer's AMP™ technology when, in fact, QIAGEN does not have a license to Archer's AMP™ technology or freedom to operate.

59.     On information and belief, these false statements are systematic and part of a campaign that has either been authorized or sanctioned by QIAGEN.  The seeds of that campaign were sown even before QIAGEN launched its own competing products.  For example, in a meeting with Archer held on May 20, 2015 at which QIAGEN sales representatives were present, during the time when Archer and QIAGEN were exploring QIAGEN distributing Archer's existing AMP™ products, Arnold made the false statement that "QIAGEN owns Archer."  Archer had no knowledge at this time that QIAGEN was planning to

32

launch its own competing products and use this false assertion to bolster QIAGEN's sales of those products.

60.     QIAGEN's false statements are material in that they are likely to influence and have influenced purchasing decisions by End-users and potential End-users.

61.     Due in large part to the success of Archer's VariantPlex®, FusionPlex®, Reveal ctDNA™, and Immunoverse™ products, Archer has established itself as a leader in the field of NGS.  Archer's reputation is the result of many millions of dollars spent on research and development.  Unless and until QIAGEN is ordered to cease making false claims concerning the QIAseq Kits and issue corrective advertising, Archer stands to suffer a further loss of its hard-earned sales, goodwill, and End-user confidence that it may never be able to recoup.  For example, a clinical laboratory that undertakes to switch from one company's next generation sequencing kit to another company's NGS kit is required to validate that the product works within certain specifications in order to use in his or her LDT.  Thus, End-users cannot easily switch between suppliers of target enrichment assays for NGS.

62.     Further, due to QIAGEN's false and misleading promotional campaign, Archer has been required to reduce the price on its AMP™ Technology kits in order to remain competitive against QIAGEN's QIAseq Kits, which has caused severe harm to Archer's business.

**D.     Arnold Breached His Fiduciary Duties Of Care And Loyalty To Archer**

63.     Arnold, as a member of the Board of Directors of Archer, owed a fiduciary duty of loyalty and care to Archer.

64.     During at least two Archer Board of Director meetings, confidential and proprietary business information of Archer, including the identity of its End-users and sales

volumes, were discussed in the presence of Arnold.  On information and belief, Arnold relayed certain of this information to QIAGEN.

65.     On information and belief, armed with this confidential and proprietary information, QIAGEN knowingly set out to target their QIAseq Kits to specific End-users of Archer to the detriment of Archer.  For example, in or about 2016, Archer was involved in negotiations with one of its End-users for a contract by which that End-user would purchase certain of Archer's proprietary AMP™ kits.

66.     Through information obtained from Arnold, QIAGEN targeted that same End-user, which was by then Archer's highest purchasing End-user, and offered its QIAseq Kits at substantially less than Archer's price for AMP™ kits to that End-user.  Thus, QIAGEN was able to specifically undercut Archer's pricing.  As a result of QIAGEN's interference, that End-user discontinued its negotiations for the purchase of certain AMP™ kits from Archer, instead purchasing certain QIAseq kits from QIAGEN.  As a result of QIAGEN's interference, Archer lost significant profits it would have otherwise earned absent QIAGEN's unlawful practices.

67.     Arnold breached his fiduciary duties to Archer by misappropriating Archer's corporate opportunities in the NGS market for the benefit of QIAGEN's business instead of Archer's business.  Arnold's position as head of NGS at QIAGEN, his participation in developing for QIAGEN competing products utilizing Archer's patented technology and Archer Trade Secrets, his false representations to other QIAGEN employees that QIAGEN owns Archer, and QIAGEN's and Arnold's plan to undercut Archer's prices and steal Archer's End-users were inimical to Arnold's fiduciary duties to Archer.

68.     Arnold's actions constituted a breach of his duty of care and duty of loyalty that he owed Archer as a member of its Board of Directors.

69.     On information and belief, Arnold, as head of NGS at QIAGEN, actively participated in QIAGEN's development of the QIAseq Kits, and knew of and/or encouraged QIAGEN's use of Archer's patented AMP™ technology and Archer Trade Secrets in the development of competing QIAGEN products, such as the QIAseq Kits.

70.     QIAGEN was complicit in Arnold's breach of fiduciary duty at least because Arnold sat on Archer's Board as a representative of QIAGEN and QIAGEN knowingly used Archer's proprietary information, including that learned by Arnold as a member of Archer's Board, for the benefit of QIAGEN.  Thus, QIAGEN actively participated in and encouraged Arnold's breach of his fiduciary duty owed to Archer.

## COUNT I
### (Archer's Claim for Misappropriation of Trade Secrets pursuant to 18 U.S.C. § 1836(b) (the "Defend Trade Secrets Act") against Defendants)

71.     Archer repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1-40, as set forth above.

72.     Defendants have direct knowledge of Archer Trade Secrets, which are exclusive to Archer and not generally known in the industry.

73.     On information and belief, Defendants' misappropriation is related to a product or service used in, or intended for use in, interstate or foreign commerce, as QIAGEN has sold and continues to sell their QIAseq Kits throughout the United States.

74.     Archer Trade Secrets derive independent economic value by not being known or readily ascertainable by proper means to competitors.

75.     Archer Trade Secrets are the subject of efforts that were reasonable under the circumstances to maintain their secrecy.  Archer Trade Secrets are not public and are only made available to key employees on a need to know basis.  Archer takes reasonable measures to keep

its information secret.  Archer utilizes secure computer servers to ensure that its trade secrets

are not improperly used, disclosed or disseminated.  Archer's employees with access to Archer

Trade Secrets are required to undertake agreements against disclosure of Archer's confidential

information and trade secrets.  Any QIAGEN access to Archer Trade Secrets was conducted

pursuant to confidentiality obligations and such information was not permitted to be used by

QIAGEN for use in developing, making or selling competing kits.  Archer is informed and

believes that Defendants misappropriated Archer Trade Secrets by using Archer Trade Secrets

in connection with their QIAseq Kits.

76.     Archer did not give Defendants permission to use or share its Archer Trade

Secrets for any purpose other than in satisfying its obligations under the Transaction

agreements.

77.     Defendants' misappropriation has caused and continues to cause Archer

damages and irreparable injury.

78.     Defendants' misappropriation is willful and malicious and thereby entitles

Archer to an award of exemplary damages.

79.     On information and belief, Defendants' misappropriation is a continuous tort,

and has occurred from prior to May 11, 2016 through to today and is ongoing.

80.     Defendants' misappropriation of Archer Trade Secrets has caused and will

continue to cause Archer irreparable and substantial injury and therefore cannot be fully

redressed through damages alone.  An injunction prohibiting Defendants from further use or

disclosure of Archer Trade Secrets and requiring Defendants to destroy any Archer Trade

Secret information is necessary to provide Archer with complete relief.

## COUNT II

**(Plaintiffs' Claim for Patent Infringement of the '810 Patent pursuant to 35 U.S.C. §§ 271 (a), (b) and/or (c) against QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V)**

81.     Archer and MGH repeat, reallege, and incorporate by reference, as if fully set forth herein, the allegations of paragraphs 1-20, 36-37, and 41-55, as set forth above.

82.     On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have infringed and continue to infringe the '810 Patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using the QIAseq Kits within the United States.  Specifically, on information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have used the QIAseq Kits in the United States in connection with the research, development, training and/or testing activities related to launch, marketing and sale of these products, and for which no safe harbor applies.  On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. directly infringe the '810 Patent by using the QIAseq Kits in the United States when they instruct and train End-users on the use of QIAseq Kits at locations throughout the United States.  On information and belief, the foregoing constitutes direct infringement of at least claims 1 and 16 of the '810 Patent pursuant to 35 U.S.C. § 271(a).

83.     On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have infringed and continue to infringe the '810 Patent pursuant to 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, by selling and offering for sale in the United States the QIAseq Kits to End-users and instructing the End-users through instructional materials, product manuals and technical materials (including instructions contained within the kits), disseminating promotional/marketing

materials that describe the workflows and use of those kits, and otherwise instructing End-users to use the QIAseq Kits to infringe at least claims 1 and 16 of the '810 Patent.  On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. sell and distribute the QIAseq Kits with the knowledge and specific intent that these instructions will cause End-users to infringe at least claims 1 and 16 of the '810 Patent, and therefore QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have infringed and continue to infringe the '810 Patent.  On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have induced End-users to use the QIAseq Kits in methods that directly infringe at least claims 1 and 16 of the '810 Patent.

84.     On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have infringed and continue to infringe the '810 Patent pursuant to 35 U.S.C. § 271(c), literally or under the doctrine of equivalents, because they offer to sell or sell within the United States or import into the United States the QIAseq Kits for use by End-users in practicing the patented process of the '810 Patent.  The QIAseq Kits constitute a material part of the invention of the '810 Patent, and QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. know the QIAseq Kits to be especially made or especially adapted for use in infringing the '810 Patent.  Furthermore, the QIAseq Kits are not a staple article or commodity of commerce suitable for substantial noninfringing use.  QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. sell and offer for sale the QIAseq Kits with the knowledge and specific intent that their instructions and workflows will cause End-users to use the kits to infringe at least claims 1 and 16 of the '810 Patent.

85.     QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have notice of the '810 Patent, at least, as a result of the filing this Complaint on the day the '810 Patent was issued by the United States Patent & Trademark Office.  QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. will have notice of the '810 Patent, at least, on the date of service of a courtesy copy and/or service of this Complaint.  Furthermore, it is the practice in the biotechnology industry to investigate competitor's patent applications, and thus QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V., on information and belief, have been aware of the '810 Patent and its claims because of the prosecution of the patent application that issued as the '810 Patent.

86.     On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have been aware of the '810 Patent through their due diligence related to the Transaction and knowledge of the MGH License, at least because their predecessor, Enzymatics, was a party to that license following its acquisition of Archer and before Archer's subsequent spin-off, the MGH License is referenced in Transaction agreements, and the '810 Patent issued from a patent application in the same family that is subject to, and specifically identified in, the MGH License, and which was published by the United States Patent & Trademark Office on August 10, 2017.  Thus, on information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. were aware of patent applications in the family of the '810 Patent, and QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V., as a practice, would have been aware of the application and the allowed claims that issued as the '810 Patent.

87.     On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. will continue to infringe and/or induce and contribute to infringement of the '810 patent as described herein, at least because any changes to the QIAseq Kits workflow instructions must be validated by their End-users, causing a substantial burden to the End-users.  Therefore, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. are unlikely to modify their product or instructions to End-users to perform the infringing workflows of the QIAseq Kits.

88.     Archer and MGH are entitled to provisional rights under 35 U.S.C. § 154(d), as at least claim 1 of the '810 Patent is substantially identical to one or more of the published claims of the '575 Publication, which is the publication of the application that issued as the '810 Patent.  On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. had actual notice of the '575 Publication.

89.     QIAGEN Sciences', QIAGEN LLC's, QIAGEN Gaithersburg's, QIAGEN GmbH's, and QIAGEN N.V.'s infringement of the '810 Patent has injured and continues to injure Archer, causing irreparable harm, such that a permanent injunction should be issued enjoining  QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V., their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns, and all those in active concert and participation with any of the foregoing persons or entities from infringing, inducing the infringement of, or contributing to the infringement of the '810 Patent should be issued.  The Court should award Archer damages in an amount to be proven at trial, such damages comprising at least its lost profits and damages incurred for price erosion of Archer's kits, but in no event less than a reasonable royalty.

**COUNT III**
**(Archer's Claim for False Advertising pursuant to Section 43(a) of the**
**Lanham Act, 15 U.S.C. § 1125(a) against QIAGEN)**

90.     Archer repeats, realleges, and incorporates by reference, as if fully set forth

herein, the allegations of paragraphs 1-20 and 56-62, as set forth above.

91.     The claims regarding QIAGEN's relationship with Archer made by QIAGEN to

Archer End-users or potential End-users are false and misleading and violate Section 43(a) of

the Lanham Act, 15 U.S.C. § 1125(a).

92.     QIAGEN's false statements regarding its relationship with Archer are likely to

deceive and/or have deceived a substantial portion of the intended audience (End-users).

QIAGEN's false statements are material in that they are likely to influence purchasing

decisions.

93.     QIAGEN'S QIAseq Kits are sold throughout the United States, and on

information and belief, have travelled in interstate commerce.

94.     Unless QIAGEN and Arnold are enjoined by this Court and ordered to retract

and correct these claims, their false and misleading advertising activities will continue to cause

and already have caused, Archer to suffer a loss of End-user confidence, sales, profits and

goodwill and will continue to irreparably injure Archer.

95.     Archer has no adequate remedy at law.

**COUNT IV**
**(Archer's Claim for Misappropriation of Trade Secrets pursuant to**
**Del. Civil Code Title 6, § 2001 *et seq*. against Defendants)**

96.     Archer repeats, realleges, and incorporates by reference, as if fully set forth

herein, the allegations of paragraphs 1-40, as set forth above.

97.    Defendants have direct knowledge of Archer Trade Secrets, which are exclusive to Archer and not generally known in the industry.

98.    Archer Trade Secrets derive independent economic value by not being known or readily ascertainable by proper means to competitors.

99.    Archer Trade Secrets are the subject of efforts that were reasonable under the circumstances to maintain their secrecy.  Archer Trade Secrets are not public and are only made available to key employees on a need to know basis.  Archer takes reasonable measures to keep its information secret.  Archer utilizes secure computer servers to ensure that its trade secrets are not improperly used, disclosed or disseminated.  Archer's employees with access to Archer Trade Secrets are also required to undertake agreements against disclosure of Archer's confidential information and trade secrets.  Any QIAGEN access to Archer Trade Secrets was conducted pursuant to confidentiality obligations and such information was not permitted to be used by QIAGEN for use in developing, making or selling competing kits.  Archer is informed and believes that Defendants misappropriated Archer Trade Secrets by using Archer Trade Secrets in connection with their QIAseq Kits.

100.    Archer did not give Defendants permission to use or share its Archer Trade Secrets for any purpose other than in satisfying its obligations under the Transaction agreements.

101.    Defendants' misappropriation has caused and continues to cause Archer damages and irreparable injury.

102.    Defendants' misappropriation is willful and malicious and thereby entitles Archer to an award of exemplary damages.

103.    On information and belief, Defendants' misappropriation is a continuous tort and is ongoing.

104.    Defendants' misappropriation of Archer Trade Secrets has caused and will continue to cause Archer irreparable and substantial injury and therefore cannot be fully redressed through damages alone.  An injunction prohibiting Defendants from further use or disclosure of Archer Trade Secrets is necessary to provide Archer with complete relief.  An injunction requiring Defendants to destroy any Archer Trade Secret information in its possession is necessary to provide Archer with complete relief.

105.    Defendants QIAGEN Sciences and QIAGEN Gaithersburg are Delaware companies and QIAGEN LLC is registered to do business in Delaware.  QIAGEN Sciences, QIAGEN Gaithersburg and QIAGEN LLC make, use, sell and/or offer for sale throughout the United States, including Delaware, QIAseq Kits that were developed using Archer Trade Secrets.

106.    QIAGEN knowingly sells and offers for sale products developed and manufactured based on misappropriation of Archer Trade Secrets that occurred, at least in part, in the State of Delaware.

107.    Archer is a Delaware company.  Therefore, Delaware is the site of the injury of Defendants' continued misappropriation of Archer Trade Secrets because Archer has suffered injury, and continues to suffer injury, in Delaware by virtue of Defendants' unlawful actions.

**COUNT V**
**(Archer's Claim for Misappropriation of Trade Secrets pursuant to**
**Md. Com. Law §§ 11-1201−11-1209 against Defendants)**

108.    Archer repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1-40, as set forth above.

109.     Defendants have direct knowledge of Archer Trade Secrets, which are exclusive to Archer and not generally known in the industry.

110.     Archer Trade Secrets derive independent economic value by not being known or readily ascertainable by proper means to competitors.

111.     Archer Trade Secrets are the subject of efforts that were reasonable under the circumstances to maintain their secrecy.  Archer Trade Secrets are not public and are only made available to key employees on a need to know basis.  Archer takes reasonable measures to keep its information secret.  Archer utilizes secure computer servers to ensure that its trade secrets are not improperly used, disclosed or disseminated.  Archer's employees with access to Archer Trade Secrets are also required to undertake agreements against disclosure of Archer's confidential information and trade secrets.  Any QIAGEN access to Archer Trade Secrets was conducted pursuant to confidentiality obligations and such information was not permitted to be used by QIAGEN for use in developing, making or selling competing kits.  Archer is informed and believes that Defendants misappropriated Archer Trade Secrets by using Archer Trade Secrets in connection with their QIAseq Kits.

112.     Archer did not give Defendants permission to use or share its Archer Trade Secrets for any purpose other than in satisfying its obligations under the Transaction agreements.

113.     Defendants' misappropriation has caused and continues to cause Archer damages and irreparable injury.

114.     Defendants' misappropriation is willful and malicious and thereby entitles Archer to an award of exemplary damages.

115.    On information and belief, Defendants' misappropriation is a continuous tort and is ongoing.

116.    Defendants' misappropriation of Archer Trade Secrets has caused and will continue to cause Archer irreparable and substantial injury and therefore cannot be fully redressed through damages alone.  An injunction prohibiting Defendants from further use or disclosure of Archer Trade Secrets is necessary to provide Archer with complete relief.  An injunction requiring Defendants to destroy any Archer Trade Secret information in its possession is necessary to provide Archer with complete relief.

117.    Defendants QIAGEN Sciences and QIAGEN Gaithersburg are Delaware companies with a principal place of business in Maryland.  On information and belief, Arnold resides in Maryland.  QIAGEN LLC is a California LLC with a principal place of business in Maryland.  QIAGEN Sciences, QIAGEN Gaithersburg and QIAGEN LLC make, use, sell and/or offer to sell throughout the United States, including Maryland, QIAGEN's QIASeq Kits that were developed using Archer Trade Secrets.

118.    QIAGEN knowingly sells and offers for sale products developed and manufactured based on misappropriation of Archer Trade Secrets that occurred, at least in part, in the State of Maryland.

### COUNT VI
### (Archer's Claim for Misappropriation of Trade Secrets pursuant to Mass. Gen. Laws Ann. ch. 93, § 42 against Defendants)

119.    Archer repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1-40, as set forth above.

120.    Defendants have direct knowledge of Archer Trade Secrets, which are exclusive to Archer and not generally known in the industry.

121.    Archer Trade Secrets derive independent economic value by not being known or readily ascertainable by proper means to competitors.

122.    Archer Trade Secrets are the subject of efforts that were reasonable under the circumstances to maintain their secrecy.  Archer Trade Secrets are not public and are only made available to key employees on a need to know basis.  Archer takes reasonable measures to keep its information secret.  Archer utilizes secure computer servers to ensure that its trade secrets are not improperly used, disclosed or disseminated.  Archer's employees with access to Archer Trade Secrets are also required to undertake agreements against disclosure of Archer's confidential information and trade secrets.  Any QIAGEN access to Archer Trade Secrets was conducted pursuant to confidentiality obligations and such information was not permitted to be used by QIAGEN for use in developing, making or selling competing kits.  Archer is informed and believes that Defendants misappropriated Archer Trade Secrets by using Archer Trade Secrets in connection with their QIAseq Kits.

123.    Archer did not give Defendants permission to use or share its Archer Trade Secrets for any purpose other than in satisfying its obligations under the Transaction agreements.

124.    Defendants' misappropriation has caused and continues to cause Archer damages and irreparable injury.

125.    Defendants' misappropriation is willful and malicious and thereby entitles Archer to an award of exemplary damages.

126.    On information and belief, Defendants' misappropriation is a continuous tort and is ongoing.

127.     Defendants' misappropriation of Archer Trade Secrets has caused and will continue to cause Archer irreparable and substantial injury and therefore cannot be fully redressed through damages alone.  An injunction prohibiting Defendants from further use or disclosure of Archer Trade Secrets is necessary to provide Archer with complete relief.  An injunction requiring Defendants to destroy any Archer Trade Secret information in its possession is necessary to provide Archer with complete relief.

128.     QIAGEN Beverly is a Massachusetts company that, on information and belief, is at least one of the physical sites at which Archer Trade Secrets are or were located within QIAGEN.  QIAGEN Beverly was involved in the research and development of and manufactures QIAGEN's QIASeq Kits in the Commonwealth of Massachusetts.

129.     QIAGEN knowingly sells and offers for sale products developed and manufactured based on misappropriation of Archer Trade Secrets that occurred, at least in part, in the Commonwealth of Massachusetts.

## COUNT VII
**(Archer's Claim for Breach of Fiduciary Duty of Care and Duty of Loyalty against Arnold)**

130.     Archer repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1-37, as set forth above.

131.     Having been a member of the Board of Directors of Archer, Arnold owed a fiduciary duty to Archer, and owed Archer a duty to use due care in the conduct of its business, a duty of loyalty, and a duty of good faith.

132.     During at least two Archer Board of Director meetings, confidential and proprietary business information of Archer, including the identity of Archer's End-users and sales volumes, were discussed in the presence of Arnold.  On information and belief, Arnold relayed certain of this information to QIAGEN.

133. Armed with this confidential and proprietary information, QIAGEN knowingly set out to target their QIAseq Kits to specific End-users of Archer to the detriment of Archer. For example, QIAGEN, through information obtained from Arnold, was able to specifically undercut Archer's pricing and caused termination of negotiations between Archer and certain of its End-users.

134. Arnold breached his fiduciary duties to Archer by misappropriating Archer's corporate opportunities in the NGS market for the benefit of QIAGEN's business instead of Archer's business. Arnold's position as head of NGS at QIAGEN, his participation in developing competing products utilizing Archer's patented technology and Archer Trade Secrets, his false representations that QIAGEN owned Archer, and QIAGEN's and Arnold's plan to undercut Archer's prices and steal Archer's End-users were inimical to Arnold's fiduciary duties to Archer.

135. On information and belief, Arnold, as head of NGS at QIAGEN, actively participated in QIAGEN's development of the QIAseq Kits, and knew of and/or encouraged QIAGEN's use of Archer's proprietary patented and Archer Trade Secrets in the development of competitive QIAGEN products, such as the QIAseq Kits.

136. Arnold's actions constituted a breach of his duty of care and duty of loyalty that he owed Archer as a member of its Board of Directors.

137. Arnold breached his fiduciary duty of care and duty of loyalty by placing Defendants' economic interests above those of Archer and its creditors/investors and acting in a manner contrary to Archer's business interests.

138. Arnold breached his fiduciary duty of care and loyalty to Archer by exploiting Archer's corporate opportunities in the NGS market which Archer itself was able to exploit

and, in fact, was exploiting, and taking Archer's corporate opportunities for the benefit of QIAGEN.

139.    Arnold failed to disclose to Archer that QIAGEN was developing a competing product and failed to recuse himself from Board of Director meetings, and conspired with QIAGEN in concealing this information.

140.    Archer is informed and believes that Arnold's fiduciary and loyalty violations were and continue to be willful and intentional.

141.    As a result of Arnold's breach of fiduciary duty, Archer has suffered and continues to suffer irreparable injury, for which Archer has no adequate remedy at law.

## COUNT VIII
### (Archer's Claim for Aiding and Abetting Arnold's Breach of his Fiduciary Duty of Care and Duty of Loyalty to Archer, against QIAGEN)

142.    Archer repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1-37, as set forth above.

143.    Through Arnold, QIAGEN knowingly participated in the breaches of fiduciary duties of loyalty and care owed by Arnold to Archer.

144.    Arnold breached his fiduciary duties to Archer by misappropriating Archer's corporate opportunities in the NGS market for the benefit of QIAGEN's business instead of Archer's business.  Arnold's position as head of NGS at QIAGEN, his participation in developing for QIAGEN competing products utilizing Archer's patented technology and Archer Trade Secrets, his false representations that QIAGEN owned Archer, and QIAGEN's and Arnold's plan to undercut Archer's prices and steal Archer's End-users were inimical to Arnold's fiduciary duties to Archer.

145.     On information and belief, Arnold, as head of NGS at QIAGEN, actively participated in QIAGEN's development of the QIAseq Kits, and knew of and/or encouraged QIAGEN's use of Archer's proprietary patented technology and Archer Trade Secrets in the development of competitive QIAGEN products, such as the QIAseq Kits.

146.     Arnold breached his fiduciary duty of care and loyalty to Archer by exploiting Archer's corporate opportunities in the NGS market which Archer itself was able to exploit and, in fact, was exploiting, and taking Archer's corporate opportunities for the benefit of QIAGEN.

147.     QIAGEN was complicit in Arnold's breach of fiduciary duty at least because Arnold sat on Archer's Board as a representative of QIAGEN and QIAGEN knowingly used Archer's proprietary information, including that learned by Arnold as a member of Archer's Board, for the benefit of QIAGEN.

148.     QIAGEN and Arnold knowingly engaged in a plan to use Archer's patented AMP™ Technology and Archer Trade Secrets to develop a competitive product to Archer's AMP™ kits, leverage sales by trading on Archer's reputation, falsely telling End-users QIAGEN was owned or licensed by Archer, and undercutting Archer's prices in order to steal Archer's End-users.

149.     Arnold's actions constituted a breach of his duty of care and duty of loyalty that he owed Archer as a member of its Board of Directors.  QIAGEN aided and abetted Arnold in assisting him to place Defendants' economic interests above those of Archer and its creditors/investors and acting in a manner contrary to Archer's business interests.  QIAGEN actively participated in and encouraged Arnold's breach of his fiduciary duty owed to Archer.

150.     Arnold failed to disclose to Archer that QIAGEN was developing a competing product and failed to recuse himself from Board of Director meetings, and conspired with QIAGEN in concealing this information.

151.     QIAGEN's aiding and abetting Arnold's breach of fiduciary duty was and is willful and malicious and thereby entitles Archer to an award of exemplary damages.

**COUNT IX**
**(Archer's Claim for Deceptive Trade Practices pursuant to Del. Civil Code Title 6, § 2532;**
**Florida's Deceptive and Unfair Trade Practices Act §§ 501.201-.213;**
**California Bus. & Prof. Code §§ 17500, 17500.5, 17505and 17535;**
**and Texas Bus. and Comm. Code Title 2, § 17.01 *et seq*. against QIAGEN)**

152.     Archer repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1-20 and 56-62, as set forth above.

153.     The claims regarding QIAGEN's relationship with Archer made by QIAGEN and Arnold are false and misleading and violate at least Del. Civil Code Title 6, § 2532; Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), sections 501.201-.213; California Bus. & Prof. Code § 17500, 17500.5, 17505 and 17535; and Texas Bus. And Comm. Code Title 2, § 17.01 *et seq*.

154.     QIAGEN's false statements regarding its relationship with Archer are likely to deceive and/or have deceived a substantial portion of the intended audience (End-users). QIAGEN's false statements are material in that they are likely to influence purchasing decisions.

155.     QIAGEN'S QIAseq Kits are sold throughout the United States, and on information and belief have travelled in interstate commerce.

156.     Unless QIAGEN and Arnold are enjoined by this Court and ordered to retract and correct these claims, its false and misleading advertising activities will continue to cause, as

they already have caused, Archer to suffer a loss of End-user confidence, sales, profits and goodwill and will continue to irreparably injure Archer.

157.    Archer has no adequate remedy at law.

158.    Archer is a Delaware company.  Therefore, Delaware is the site of the injury of Defendants' unfair business practices because Archer suffered injury, and continues to suffer injury, in Delaware by virtue of Defendants' unlawful actions.  Furthermore, on information and belief, false and misleading statements were made in, at least, Florida, California, and Texas.

## COUNT X
### (Archer's Claim for Common Law Tortious Interference with Prospective Business Relations against QIAGEN)

159.    Archer repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1-70, as set forth above.

160.    Defendants' misappropriation of Archer Trade Secrets, infringement of the Patents, usurpation of Archer's corporate opportunities and aiding and abetting of Arnold's breach of fiduciary duties is a pattern of conduct intended to interfere with, that has interfered with and that continues to interfere with Archer's business relationships with its End-users and potential End-users.

161.    In or about 2016, Archer was involved in negotiations with one of its End-users for a contract by which that End-user would purchase certain Archer proprietary AMP™ kits.

162.    On information and belief, based on information known to Arnold by virtue of his seat on Archer's Board of Directors, QIAGEN targeted that End-user, which was by then Archer's highest purchasing End-user, and offered certain QIAseq Kits at substantially less than Archer's price for its AMP™ kits.

163.     By virtue of QIAGEN's interference with Archer's relationship with that End-user, that End-user instead purchased certain QIAGEN QIASeq kits developed from QIAGEN's unlawful taking of Archer's proprietary technologies.  As a result of QIAGEN's interference, that End-user discontinued its negotiations for the purchase of certain AMP™ kits from Archer, instead purchasing certain QIAseq Kits from QIAGEN.

164.     As a result of QIAGEN's interference, Archer lost significant profits it would have otherwise earned absent QIAGEN's unlawful practices.

## COUNT XI
**(Plaintiffs' Claim for Patent Infringement of the '597 Patent pursuant to 35 U.S.C. §§ 271 (a), (b) and/or (c) against QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V)**

165.     Archer repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1-20, 36-37, 41-55, as set forth above.

166.     On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have infringed and continue to infringe the '597 Patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using the QIAseq Kits within the United States.  Specifically, on information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have used the QIAseq Kits in the United States in connection with the research, development, training and/or testing activities related to launch, marketing and sale of these products, and for which no safe harbor applies.  On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. directly infringe the '597 Patent by using the QIAseq Kits in the United States when they instruct and train End-users on the use of QIAseq Kits at locations throughout the United States.  On information and

belief, the foregoing constitutes direct infringement of at least claim 1 of the '597 Patent

pursuant to 35 U.S.C. § 271(a).

167.    On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN

Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have infringed and continue to infringe the

'597 Patent pursuant to 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, by

selling and offering for sale in the United States the QIAseq Kits to End-users and instructing

the End-users through instructional materials, product manuals and technical materials

(including instructions contained within the kits), disseminating promotional/marketing

materials that describe the workflows and use of those kits, and otherwise instructing End-users

to use the QIAseq Kits to infringe at least claim 1 of the '597 Patent.  On information and

belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and

QIAGEN N.V. sell and distribute the QIAseq Kits with the knowledge and specific intent that

these instructions will cause End-users to infringe at least claim 1 of the '597 Patent, and

therefore QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and

QIAGEN N.V. have infringed and continue to infringe the '597 Patent.  On information and

belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and

QIAGEN N.V. have induced End-users to use the QIAseq Kits in methods that directly infringe

at least claim 1 of the '597 Patent.

168.    On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN

Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have infringed and continue to infringe the

'597 Patent pursuant to 35 U.S.C. § 271(c), literally or under the doctrine of equivalents,

because they offer to sell or sell within the United States or import into the United States the

QIAseq Kits for use by End-users in practicing the patented process of the '597 Patent.  The

QIAseq Kits constitute a material part of the invention of the '597 Patent, and QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. know the QIAseq Kits to be especially made or especially adapted for use in infringing the '597 Patent.  Furthermore, the QIAseq Kits are not a staple article or commodity of commerce suitable for substantial noninfringing use.  QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. sell and offer for sale the QIAseq Kits with the knowledge and specific intent that their instructions and workflows will cause End-users to use the kits to infringe at least claim 1 of the '597 Patent.

169.    On information and belief, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. will continue to infringe and/or induce and contribute to infringement of the '597 Patent as described herein, at least because any changes to the QIAseq Kits workflow instructions must be validated by their End-users, causing a substantial burden to the End-users.  Therefore, QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. are unlikely to modify their product or instructions to End-users to perform the infringing workflows of the QIAseq Kits.

170.    Archer and MGH are entitled to provisional rights under 35 U.S.C. § 154(d), as QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. had actual notice of the claims substantially identical to one or more of the claims of the '597 Patent, at least as early as September 10, 2019, when counsel for QIAGEN was notified via letter of the claims and pending issuance of the '597 Patent.

171.    QIAGEN Sciences', QIAGEN LLC's, QIAGEN Gaithersburg's, QIAGEN GmbH's, and QIAGEN N.V.'s infringement of the '597 Patent has injured and continues to injure Archer, causing irreparable harm, such that a permanent injunction should be issued

enjoining  QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN GmbH, and

QIAGEN N.V., their employees, agents, officers, directors, attorneys, successors, affiliates,

subsidiaries and assigns, and all those in active concert and participation with any of the

foregoing persons or entities from infringing, inducing the infringement of, or contributing to

the infringement of the '597 Patent should be issued.  The Court should award Archer damages

in an amount to be proven at trial, such damages comprising at least its lost profits and damages

incurred for price erosion of Archer's kits, but in no event less than a reasonable royalty.

## DEMAND FOR JURY TRIAL

Archer and MGH demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Archer and MGH demand judgment as follows:

a.  Declaring that QIAGEN Sciences, QIAGEN LLC, QIAGEN Beverly, QIAGEN
Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. and Arnold have
misappropriated Archer's trade secret information pursuant to the Defend Trade
Secrets Act, Delaware Uniform Trade Secrets Act, Maryland Uniform Trade
Secrets Act, and/or Massachusetts Trade Secrets Act;

b.  Declaring that QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg,
QIAGEN GmbH, and QIAGEN N.V. have infringed the Patents;

c.  Declaring that QIAGEN Sciences, QIAGEN LLC, QIAGEN Beverly, QIAGEN
Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have provided false,
misleading, and unfair claims in statements to End-users, in violation of Section
43(a) of the Lanham Act and Del. Civil Code Title 6, § 2532, Florida's Deceptive
and Unfair Trade Practices Act (FDUTPA), sections 501.201-.213, California

Bus. & Prof. Code § 17500, 17500.5, 17505 and 17535, and Texas Bus. And

Comm. Code Title 2, § 17.01 *et seq*;

d.    Declaring that Arnold has breached his fiduciary duty of care and loyalty to

Archer and declaring that QIAGEN aided and abetted Arnold's breach;

e.    Declaring that QIAGEN Sciences, QIAGEN LLC, QIAGEN Beverly, QIAGEN

Gaithersburg, QIAGEN GmbH, and QIAGEN N.V. have tortiously interfered

with Archer's business relationship with Archer's End-users and potential End-

users;

f.    Enjoining QIAGEN Sciences, QIAGEN LLC, QIAGEN Beverly, QIAGEN

Gaithersburg, QIAGEN GmbH, QIAGEN N.V. and Arnold and their respective

officers, agents, servants, employees and attorneys, and all other persons in active

concert or participation with them, from using Archer Trade Secrets (as defined

above), and from selling, offering for sale marketing or using QIAseq Kits;

g.    Enjoining QIAGEN Sciences, QIAGEN LLC, QIAGEN Gaithersburg, QIAGEN

GmbH, and QIAGEN N.V. and their respective officers, agents, servants,

employees and attorneys, and all other persons in active concert or participation

with them, from selling, offering for sale, marketing or using QIAseq Kits and

any other product that infringes the Patents;

h.    Enjoining QIAGEN Sciences, QIAGEN LLC, QIAGEN Beverly, QIAGEN

Gaithersburg, QIAGEN GmbH, QIAGEN N.V. and Arnold and their respective

officers, agents, servants, employees and attorneys, and all other persons in active

concert or participation with them, to place appropriate corrective messages to

End-users, reasonably designed to reach all persons to whom the QIAGEN

Sciences, QIAGEN LLC, QIAGEN Beverly, QIAGEN Gaithersburg, QIAGEN GmbH, QIAGEN N.V. oral communications were directly or indirectly disseminated, and retracting the false, misleading, and unfair claims contained in those oral statements;

i.   Awarding damages as described in each of the above claims, in favor of Archer and MGH and against QIAGEN Sciences, QIAGEN LLC, QIAGEN Beverly, QIAGEN Gaithersburg, QIAGEN GmbH, QIAGEN N.V. and Arnold in amounts to be determined at trial;

j.   Awarding Archer all of QIAGEN Sciences, QIAGEN LLC, QIAGEN Beverly, QIAGEN Gaithersburg, QIAGEN GmbH, and QIAGEN N.V.'s  profits, gains and advantages derived from QIAGEN and Arnold's unlawful conduct, such damages to be trebled pursuant to 15 U.S.C. § 1117;

k.   Awarding Archer all damages sustained by Archer by reason of QIAGEN Sciences, QIAGEN LLC, QIAGEN Beverly, QIAGEN Gaithersburg, QIAGEN GmbH, QIAGEN N.V.  and Arnold's unlawful conduct, including all expenditures required to correct the false, misleading, and unfair descriptions and representations alleged herein, such damages to be trebled pursuant to 15 U.S.C. § 1117;

l.   Awarding Archer exemplary and punitive damages as the Court finds appropriate to deter any future willful conduct;

m.   Ordering QIAGEN Sciences, QIAGEN LLC, QIAGEN Beverly, QIAGEN Gaithersburg, QIAGEN GmbH, QIAGEN N.V. and Arnold to destroy any Archer Trade Secret information in their possession; and

n.    Awarding Archer and MGH pre-judgment and post-judgment interest, and its

attorneys' fees, costs and other expenses incurred in this action;

o.    Awarding Archer and MGH such other and further relief as this Court deems just

and proper.

*/s/ Jeff Castellano*

John W. Shaw (No. 3362)

Jeff Castellano (No. 4837)

Nathan R. Hoeschen (No. 6232)

SHAW KELLER LLP

I.M. Pei Building

1105 North Market Street, 12th Floor

Wilmington, DE 19801

(302) 298-0700

jshaw@shawkeller.com

jcastellano@shawkeller.com

nhoeschen@shawkeller.com

*Attorneys for Plaintiffs ArcherDX, Inc. and*

*The General Hospital Corporation d/b/a*

*Massachusetts General Hospital*

OF COUNSEL:

Steven M. Bauer

Kimberly A. Mottley

PROSKAUER ROSE LLP

One International Place

Boston, MA 02110

(617) 526-9600

Dated: October 22, 2019