## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARCHERDX, LLC and THE GENERAL HOSPITAL CORPORATION d/b/a MASSACHUSETTS GENERAL HOSPITAL,<br><br>Plaintiffs,<br><br>v.<br><br>QIAGEN SCIENCES, LLC, QIAGEN LLC f/k/a QIAGEN, INC., QIAGEN BEVERLY, LLC f/k/a QIAGEN BEVERLY, INC., QIAGEN GAITHERSBURG, LLC f/k/a QIAGEN GAITHERSBURG, INC., QIAGEN GMBH, QIAGEN N.V. and JONATHAN ARNOLD,<br><br>Defendants. | C.A. No. 18-1019-MN<br><br>**PUBLIC VERSION** |

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF NO TRADE SECRET MISAPPROPRIATION

OF COUNSEL:

David Bilsker
Andrew Naravage
QUINN EMANUEL URQUHART & SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: (415) 875-6600

Anne Toker
James E. Baker
Anastasia M. Fernands
QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
Tel: (212) 849-7000

Jeffrey C. Wu
QUINN EMANUEL URQUHART & SULLIVAN LLP
60 E South Temple, Suite 500
Salt Lake City, UT 84111
Tel: (801) 515 7300

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

*Attorneys for Defendants Qiagen Sciences, LLC, Qiagen LLC f/k/a Qiagen, Inc., Qiagen Beverly LLC, f/k/a Qiagen Beverly, Inc., Qiagen Gaithersburg LLC, f/k/a Qiagen Gaithersburg, Inc., Qiagen GmbH, Qiagen N.V. and Jonathan Arnold*

Dated: March 1, 2021
7072557 / 45349
PUBLIC VERSION Dated: March 9, 2021

**TABLE OF CONTENTS**

        **Page**

I.     INTRODUCTION ............................................................................................................. 1

II.    NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 2

III.   SUMMARY OF ARGUMENT ......................................................................................... 2

IV.   STATEMENT OF FACTS AND ARGUMENT ............................................................... 3

       A.     Archer Cannot Meet Its Burden to Show Ownership of the Alleged Trade Secrets ................................................................................................................... 4

           1.     The ATA Does Not Impose Any Restrictions on Enzymatics' Sale of Reagents ........................................................................................................ 5

           2.     The "Earn-out" Provisions in the MA Would Not Make Sense Under Archer's Interpretation of the ATA ............................................................ 9

           3.     Archer's Corporate Witness Contradicted Archer's Responses to Requests for Admission Regarding the ATA ........................................................... 11

       B.     There Was no Transfer of Any Purported Archer Trade Secret Information From Enzymatics to Qiagen ...................................................................................... 13

       C.     QIAGEN Is Not Using Any of the Purported Archer Trade Secrets .................... 14

V.    CONCLUSION ............................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Chase Commercial Corp. v. Owen*,
    32 Mass. App. Ct. 248, 588 N.E.2d 705 (1992) .......................................................................... 4

*Graham v. State Farm Mut. Auto. Ins. Co.*,
    565 A.2d 908, 912 (Del. 1989) .................................................................................................. 4

*Klaassen v. Allegro Dev. Corp.*,
    106 A.3d 1035, 1047 (Del. 2014) ............................................................................................ 10

*Pritchard v. State of Delaware Dep't of Corr.*,
    No. CV 18-0008 (MN), 2020 WL 6261636 (D. Del. Oct. 23, 2020) ........................................ 3

I.     INTRODUCTION

QIAGEN is a multinational company that for many decades been a leading provider of tools used in the Biotechnology industry.  Enzymatics was a company formed in 2005 to provide reagents to the biotechnology industry.  In 2013, Archer, who at that time was just one or two employees, had an idea for a product and began looking for a company to manufacture what it would eventually create.  This search eventually led to Enzymatics acquiring Archer after the initial approach about manufacturing product.

In early 2014, QIAGEN scientists had mapped out and tested the design for the next generation of its library preparation kits for detecting various cancers at its Frederick, Maryland facility.  In late 2014, it decided to acquire Enzymatics because it saw upside in its reagents business.  But, QIAGEN did not believe that the Archer portion of the business fit into its plans.  Thus, as part of its merger and acquisition of Enzymatics, Archer was simultaneously spun out as a separate company on December 14, 2014.  To assist Archer in succeeding, QIAGEN agreed as part of the spin out to invest in Archer.  QIAGEN, in fact, became the largest investor.

To identify the rights Archer would acquire, the parties entered into the Asset Transfer Agreement ("ATA").  That Agreement gave Archer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ kits for the detection of cancer that was its business.  The Agreement contained ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

The crux of the dispute that Archer claims is one for misappropriation of trade secrets is whether Archer acquired, through the ATA, ownership rights to two reagents that Enzymatics sells.  Nowhere does the ATA provide those rights.  And, nowhere does the ATA provide any limitations on Enzymatics' right to sell reagents that the ATA unequivocally states it owns, as Archer is trying to allege now.  For these reasons, summary judgement should be granted finding

that Archer is not the owner of its alleged trade secrets and that its misappropriation claims fail for numerous other reasons.

## II. NATURE AND STAGE OF THE PROCEEDINGS

The parties have completed fact and expert discovery. Pursuant to the Court's scheduling order, Defendants now move this Court for summary judgment of no trade secret misappropriation on each of Counts I, IV, V, and VI of the Amended Complaint (D.I. 130). Archer DX, Inc. ("Archer") alleges that Defendants have misappropriated various purported Archer "trade secrets" through the sale of certain reagents by QIAGEN Beverly (formerly known as Enzymatics) to affiliated QIAGEN entities, mainly the Fredrick, Maryland division of QIAGEN that buys reagents from QIAGEN Beverly, which it uses to make library preparation kits that are then sold to third party customers. To support these allegations, Archer's expert has offered opinions that QIAGEN has misappropriated Archer trade secrets relating to a fragmentation mix and relating to the use of certain Enzymatics reagents in an end repair/A-tailing mix. Because neither the fragmentation mix nor the end repair/A tailing mix are owned by Archer, because QIAGEN independently developed the accused products without relying on any Archer "trade secret" information, and because the accused products in any event do not use the alleged trade secrets, Counts I, IV, V, and VI fail.

## III. SUMMARY OF ARGUMENT

As set out in more detail below, on December 16, 2014, QIAGEN acquired Enzymatics, Inc. and spun out Archer as a separate company ("the Transaction"). Pursuant to the Transaction, the parties entered into the ATA (Ex. 1), which transferred a very defined, limited set of assets from Enzymatics (referred to as "Remainco" in the ATA) to Archer (referred to as "Spinco" in the ATA). Yet, Archer has taken an overreaching, shotgun approach to its trade

2

secret allegations in this case, identifying in its initial disclosures nearly a thousand allegedly misappropriated "trade secrets," including, for example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 3 at 10-20. When these allegations failed to survive scrutiny, Archer propounded a theory rooted in breach of the ATA. The ATA provisions, however, are contrary to Archer's position. For example, Archer alleges that QIAGEN has misappropriated various Archer "trade secrets" that were expressly retained and owned by Enzymatics under the ATA and not transferred to Archer. Archer's theory is so convoluted that Archer itself cannot keep it straight. Archer's corporate witness, who was the general counsel of Enzymatics and then the president and later general counsel of Archer, contradicted Archer's responses to Defendants' Requests for Admission in addressing the parties' rights and limitations pursuant to the ATA..

Archer cannot prove that the ATA gave it any ownership or other right in the alleged trade secrets that allow it to maintain its claims for trade secret misappropriation against QIAGEN. Archer also cannot prove that Enzymatics communicated any of the purported Archer "trade secret" information to QIAGEN Frederick, the QIAGEN entity that independently created its own library preparation kits before QIAGEN ever bought Enzymatics. Finally, the accused QIAGEN kits do not use any of the purported Archer "trade secrets."

## IV.   STATEMENT OF FACTS[1] AND ARGUMENT

This Court is well versed in the standard for summary judgment. *See, e.g.*, *Pritchard v. State of Delaware Dep't of Corr.*, No. CV 18-0008 (MN), 2020 WL 6261636, at *2-3 (D. Del. Oct. 23, 2020). To the extent Archer holds any ownership right in any of the alleged Archer

---

[1]  Defendants incorporate their Concise Statement of Facts filed concurrently herewith.

trade secrets at issue in this case that would allow it to bring a cause of action for trade secret misappropriation against QIAGEN, Archer would have to have acquired such a right pursuant to the ATA. The ATA provides that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 1 § 10.6 (ADX-002222). Accordingly, the parties have waived their right to a jury trial on the issue of misappropriation of the alleged Archer trade secrets. *Chase Commercial Corp. v. Owen*, 32 Mass. App. Ct. 248, 588 N.E.2d 705 (1992); *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 912 (Del. 1989).

Under the Defend Trade Secrets Act, only the owner of a trade secret may bring a private civil action for misappropriation. *See* 18 U.S.C. § 1836(b)(1) (the "Defend Trade Secrets Act"); 18 U.S.C. § 1839(4). Under the Delaware Civil Code, the Maryland Commercial Law, and the Massachusetts General Laws, the cause of action for trade secret misappropriation requires that the trade secret be the trade secret "of another." *See* Del. Civil Code Title 6, § 2001(2); Md. Com. Law, §§ 11-1201(c); Mass. Gen. Laws Ann., ch. 93, § 42(2).

A. **Archer Cannot Meet Its Burden to Show Ownership of the Alleged Trade Secrets**

Enzymatics was a successful company making and selling Reagents used in the biotech industry. In 2013 it acquired Archer, a nascent company with no products and a desire to build kits that could be used to identify mutations relevant to cancer. Ex. 23 at ADX-000499809. In 2014, QIAGEN decided to purchase Enzymatics. D.I. 130 ¶ 22. The Archer part of the business did not make sense for QIAGEN and it decided to spin that company out. *Id.* ¶ 23. At the same time, QIAGEN became the largest investor in Archer, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Ex. 24 at QIA-00819679-81; Ex. 25 at QIA-819696. As part of the spinout, the parties entered into a series of agreements. *See* D.I. 130

4

¶ 24. At issue here is primarily the ATA, which created all the rights that Archer acquired to technology formerly owned by Enzymatics. The only way Archer could have acquired rights in the purported trade secrets it is asserting is under the ATA. But nothing in the ATA shows that Archer acquired ownership of those reagents. Quite the opposite is true.

1. **The ATA Imposes No Restrictions on Enzymatics' Sale of Reagents**

The ATA provides that ▮



Ex. 1 § 1.2 (ADX-002203). The "Reagents Business" is defined to include ▮

▮ Ex. 1 at ADX-002230.

The ATA further provides that "'Reagents Products' shall mean the products listed on Annex 2." *Id.* Annex 2 lists a large number of different categories of products, including: (1) enzymes such as ▮

▮ Ex. 1 Annex 2 (ADX-002252-55).

The definition of "Reagents Business" in the ATA ▮

5


. Pursuant to § 7.2 of the ATA, ▮▮▮. Ex. 1 § 7.2(a) (ADX-002213). ▮▮▮ Ex. 2 at 190:4-12.

The Transferred Assets include, in relevant part, "the Transferred Know-How" (Ex. 1 § 1.1(a)(ii)), which, in turn, is defined as ▮▮▮ Ex. 1 at ADX-0002232 (emphasis added). ▮▮▮ *Id.* at ADX-0002227. ▮▮▮ *Id.* at 0002228. ▮▮▮ *Id.* at ADX-002226. ▮▮▮

███████████████████████████████████████████████████████

*Id.* ███████████████████████████████████████████████

███████████████████████████████████████████████

The ATA also makes clear that ████████████████ belongs to Enzymatics.

███████████████████████████████████████████████

███████████████████████████████████. Ex. 1 Schedule 1.1(a)(ii) (ADX-002235). ████████████████████████████████████████

█████████████████████████████████████████

█████████████ Ex. 13 §§ 1.12, 2.13-2.15 (ADX-000017419, 17421-22). The ATA identifies the following enzymes as subject to ████████████ ████████ ████[3] ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████ Notably, each of these enzymes is listed on Annex 2, which lists "Reagents Products." Ex. 1 Annex 2 (ADX-002253-55).

The express language of the ATA transferred to Archer only Enzymatics Know-How █ ███████████████████████████ Archer's trade secret misappropriation claims, however, are so broad as to encompass the inclusion in QIAGEN library preparation kits of multiple reagents listed on ATA Annex 2 of the ATA as undeniably retained by Enzymatics ███████████████████████████████████████████

█████████████ Ex. 3; Ex. 1 Annex 2 (ADX-002253-55). The accused fragmentation

---

2 ████████████████████████████████████████

3 ████████████████████████████████████████████

enzyme mix and end repair/A-tailing enzyme mix were not yet products listed in the Enzymatics catalogue with part numbers at the time of the ATA. But they were certainly reagents that belonged to Enzymatics. For example, Annex 2 lists an "End-Repair Mix" that had been commercialized at that time. Ex. 1 Annex 2 (ADX-002253-55). Given that the ATA definition ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████ ███████████████████████████████████████████████████████████████████████ ███████, belongs to Enzymatics. Ex. 1 at ADX-002230. ███████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████ ████████████████████████████ █████████████████████████████ ███████████████████████████████████████████████████████████████████████ █████████████████████

Archer now claims that the ATA restricts who Enzymatics can sell reagents to and for what purpose. But, the ATA nowhere conferred on Archer any right to exclude Enzymatics from selling Reagents Products to any purchaser, including other QIAGEN entities, for any purpose whatsoever. On the contrary, as discussed above, ███████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████ To permit this, ██████████████████████████████████ ███████, which were kits that contained ███████████████████████████████ ███████████████████████████████████████████████████████████████████████ █████████████████████████ Ex. 1 at ADX-002226. At the same time, █████████████ ██████████████████████████████████████. *Id.* at ADX-002230. Through this definition of

8

Reagent Business, ▮▮▮▮▮

▮▮▮▮▮  ▮▮▮▮▮

▮▮▮▮▮ It provides no prohibition on what Enzymatics can do. ▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮

### 2. The ▮▮▮▮▮ in the Merger Agreement Would Not Make Sense Under Archer's Interpretation of the ATA

The ▮▮▮▮▮ in the Merger Agreement ("MA") confirm that the ATA did not transfer to Archer any ownership right in the purported trade secrets that would allow it to assert those purported trade secrets against QIAGEN when Enzymatics sells the reagents to other QIAGEN entities that place them into kits sold to third parties. ▮▮▮▮▮

▮▮▮▮▮  Ex. 2 at 84:18-21, 85:3-6.  ▮▮▮▮▮  Ex. 12 at 172:13-19.

▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮  *See* Concise Statement of Facts ¶ 9.  ▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮ The Archer founders, including the inventors of the asserted patents in this case, U.S Patent Nos. 10,017,810 and 10,450,597, shareholders, board members, employees, VC company board members, and other former Enzymatics people who joined

9

Archer after the Transaction, ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮ that Archer claims as its "trade secrets," *e.g.*, the fragmentation enzyme mix, end repair/A-tailing enzyme mix, ▮▮▮▮▮ *See, e.g.*, Exs. 11, 12, 14-19; Ex. 4 at 100:7-20, 101:6-17, 109:19-112:23, 124:12-126:14, 127:13-128:2, 129:4-8, 129:17-130:5, 130:21-133:15, 220:17-19, 221:9-15, 222:2-227:25, 229:24-231:7, 238:8-12, 243:14-244:18; Ex. 2 at 200:9-203:8; 212:25-213:13; 216:16-217:3; Ex. 3 at 13-20.

It makes no sense for Archer to have negotiated for and accepted, on the one hand, ▮▮▮▮▮, and, on the other hand, to claim as it is doing now, that Enzymatics is prohibited from making such sales. *See Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014) (noting claimant can be deemed to have acquiesced in a complained-of act). ▮▮▮▮▮ Ex. 1 § 7.2(a) (ADX-002213). ▮▮▮▮▮ Enzymatics was developing and selling reagents without restriction, for any purpose, for years before Enzymatics merged with Archer in 2013. Ex. 20 at 194:24-195:9; Ex. 21 at 17:9-19; Ex. 4 at 87:20-89:15. ▮▮▮▮▮ Ex. 26 at QIA-00772181; Ex. 27; Ex. 31 ¶¶ 944-55. This evidence

10

further supports Defendants' position that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ It would make no sense for Enzymatics' reagents business to have been *more* restricted *after* the Archer spinoff than it was before the merger with Archer.

Archer's conduct prior to filing this case also supports Defendants' position that neither the ATA nor any other relevant agreement restricts Enzymatics' right to sell reagents to QIAGEN affiliated companies for any purpose whatsoever. In particular, Archer admitted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 22 at 7 (RFA Response No. 3)); (2) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 22 at 8 (RFA Response No. 4)); (3) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 22 at 9 (RFA Response No. 6)); (4) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 22 at 10 (RFA Response No. 7)). Tellingly, Archer further admitted that prior to filing this case, it never expressly requested that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 22 at 8-9 (RFA Response No. 5)).

### 3. Archer's Corporate Witness Contradicted Archer's Responses to Requests for Admission Regarding the ATA

Attempting to overcome the indisputable evidence that the end repair/A tailing mix and

fragmentation mix are reagents that belong to Enzymatics pursuant to the ATA, in the absence of a showing that they are somehow exclusively related to Archer's business, Archer creates illusory restrictions on Enzymatics' right to sell reagents, even those listed in Annex 2 as unassailably belonging to Enzymatics. The restrictions that Archer relies on appear nowhere in the ATA or any other relevant agreement, and Archer itself is unable to even keep its arguments clear. In particular, the testimony of Archer's Fed. R. Civ. P. 30(b)(6) witness, LaPointe, directly contradicts Archer's responses to QIAGEN's Requests for Admissions (RFAs) regarding Enzymatics' rights, pursuant to the ATA, to sell reagents to affiliated QIAGEN entities for inclusion in library preparation kits. The fact that Archer and Archer's corporate witness LaPointe, who signed the ATA on behalf of Archer, cannot agree on the meaning of the ATA or the rights transferred to Archer pursuant to the ATA, further demonstrates that Archer cannot meet its burden to show ownership of the alleged trade secrets.

For example, Archer stated in response to QIAGEN's RFA No. 14:



Ex. 22 at 14-15. Archer provided similar responses to QIAGEN's RFA Nos. 16 and 17. Archer stated in response to QIAGEN's RFA No. 19:



*Id.* at 17-18; *see also id.* at 18 (RFA No. 20). According to these statements, 

However, LaPointe's testimony directly contradicts Archer's statements:

Ex. 2 at 193:18-194:1.

*Id.* at 198:2-18.

There is no way to reconcile

*See*

Ex. 2 at 176:25-177:16. Archer's contradictory interpretations of the ATA support dismissal of Archer's trade secret misappropriation claims on the grounds that Archer cannot meet its burden to demonstrate ownership of the alleged trade secrets.

    **B.**     **There Was no Transfer of Any Purported Archer Trade Secret Information From Enzymatics to QIAGEN**

In addition to the fact that the ATA did not grant Archer ownership rights to the fragmentation and end repair/A tailing mix that would allow it to assert a claim for trade secret misappropriation, Archer cannot prove that QIAGEN Fredrick, who developed the products that use the alleged trade secrets received Archer "trade secret" information from Enzymatics after the acquisition of Enzymatics. Ex. 32 (Response to Interrogatory No. 6). There is no evidence

13

whatsoever to support this allegation. Ex. 33 at 13-17; Ex. 34 at 153:11-154:6; Ex. 31 ¶¶ 741-42, 959-61. In fact, QIAGEN Frederick, which developed the accused QIAGEN DNA and RNA library preparation kits, was developing and commercializing library preparation kits using many of the common reagents before the Enzymatics acquisition in December 2014. In particular, by December 2014, QIAGEN Frederick had developed and commercialized targeted DNA library preparation kits using reagents including ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 35 at 19:16-20:15, 22:22-25; Ex. 34 at 44:6-13, 46:22-25, 55:3-4, 67:3-17; Ex. 31 ¶ 958; Ex. 4 at 249:1-253:1; Ex. 36 at QIA-00019970-77. These kits included workflow steps of: (1) end repair, (2) A-tailing, (3) adaptor ligation, and (4) multiplex PCR. Ex. 36 at QIA-00019970-77.

After the Enzymatics acquisition, QIAGEN Frederick purchased reagents from Enzymatics as it would from any other supplier, and QIAGEN Frederick scientists optimized those reagents for their workflows, just as they would optimize reagents from any other vendor. Ex. 37 at 105:14-108:14, 109:8-110:10; Ex. 31 ¶¶ 741-42, 959-61. Moreover, nothing about Enzymatics being the supplier of reagents that Archer used is a trade secret as Archer now alleges. The inventors of the Archer asserted patents John Iafrate and Long Phi Le, on November 10, 2014, published a paper describing their AMP technology in which they state expressly that they used Enzymatics reagents for their workflows, including Enzymatics DNA Pol. I, RNAse H, End-Repair Mix, and T4 DNA Ligase. Ex. 38 at 7. The paper further states that they used an "adenylation" reagent that was a combination of Klenow exo- from Enzymatics, and Taq Polymerase from Life Technologies. *Id.*

### C. QIAGEN Is Not Using Any of the Purported Archer Trade Secrets

Even if Archer were able to overcome the first two hurdles to its misappropriation claims, ownership and independent development by QIAGEN Fredrick, it faces a thid insurrmountable

14

hurdle. QIAGEN is not using, and thus cannot be "misappropriating," any purported Archer "trade secrets." QIAGEN does not use Archer's purported "trade secret" fragmentation mix. Ex. 31 ¶¶ 898-909. QIAGEN's fragmentation reagent includes different components such as ███████████████ (CMB0294). Ex. 20 at 105:4-106:16; Ex. 37 at 110:12-112:12; Ex. 31 ¶¶ 719-22, 733, 741-49, 898-909. This QIAGEN fragmentation buffer, CMB0294, ███████████████. Ex. 40 at QIA-00774113; Ex. 41 at QIA-00678882; Ex. 42; Ex. 13 Annex 1.6 (ADX-000017432); Ex. 31 ¶¶ 581, 708-11. In addition, ███████████████. Ex. 37 at 110:12-112:12; Ex. 31 ¶ 755.

QIAGEN similarly is not using Archer's purported "trade secret" end repair/A tailing formulation. Ex. 31 ¶¶ 985-1000. Instead, QIAGEN is using a formulation that is ███████████████ with the addition of ███, a component not present in Archer's purported "trade secret" formulation. Ex. 26 at QIA-00772243; Ex. 27; Ex. 39; Ex. 28; Ex. 29; Ex. 31 ¶¶ 944-51. QIAGEN's end repair/A tailing buffer also bears no resemblance whatsoever to Archer's "trade secret" buffer, which is actually ███████████ that Enzymatics sells, and ███████████████ Ex. 3.; Ex. 13 Annex 1.6 (ADX-000017431); Ex. 31 ¶¶ 952-56. Instead, QIAGEN's end repair/A tailing buffers closely resemble end repair/A tailing buffers ███████████████ Ex. 26 at QIA-00772243; Ex. 27; Ex. 28; Ex. 29; Ex. 31 ¶¶ 952-56.

## V. CONCLUSION

Defendants respectfully request that the Court grant this motion and dismiss Archer's trade secret misappropriation claims.

15

|  |  |
|---|---|
| OF COUNSEL:<br><br>David Bilsker<br>Andrew Naravage<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>50 California Street, 22nd Floor<br>San Francisco, CA  94111<br>Tel:  (415) 875-6600<br><br>Anne Toker<br>James E. Baker<br>Anastasia M. Fernands<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>51 Madison Ave., 22nd Floor<br>New York, NY  10010<br>Tel:  (212) 849-7000<br><br>Jeffrey C. Wu<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>60 E South Temple, Suite 500<br>Salt Lake City, UT 84111<br>Tel: (801) 515 7300<br><br>Dated:  March 1, 2021<br>7072557 / 45349<br>PUBLIC VERSION  Dated:  March 9, 2021 | Respectfully submitted,<br><br>POTTER ANDERSON & CORROON LLP<br><br>By:  */s/ Stephanie E. O'Byrne*<br>   David E. Moore (#3983)<br>   Bindu A. Palapura (#5370)<br>   Stephanie E. O'Byrne (#4446)<br>   Hercules Plaza, 6th Floor<br>   1313 N. Market Street<br>   Wilmington, DE  19801<br>   Tel:  (302) 984-6000<br>   dmoore@potteranderson.com<br>   bpalapura@potteranderson.com<br>   sobyrne@potteranderson.com<br><br>*Attorneys for Defendants Qiagen Sciences, LLC, Qiagen LLC f/k/a Qiagen, Inc., Qiagen Beverly LLC, f/k/a Qiagen Beverly, Inc., Qiagen Gaithersburg LLC, f/k/a Qiagen Gaithersburg, Inc., Qiagen GmbH, Qiagen N.V. and Jonathan Arnold* |