# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ARCHERDX, LLC f/k/a ARCHERDX, INC. and THE GENERAL HOSPITAL CORPORATION d/b/a MASSACHUSETTS GENERAL HOSPITAL, | ) ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | C.A. No. 18-1019-MN |
| v. | ) ) ) | |
| QIAGEN SCIENCES, LLC, QIAGEN LLC f/k/a QIAGEN, INC., QIAGEN BEVERLY, LLC f/k/a QIAGEN BEVERLY, INC., QIAGEN GAITHERSBURG, INC., QIAGEN GMBH, QIAGEN N.V. and JONATHAN ARNOLD, | ) ) ) ) ) ) ) | |
| *Defendants*. | ) | |

## [PROPOSED] FINAL JURY INSTRUCTIONS

[Note:  The parties propose these final jury instructions based on the current status of the case and the Court's rulings to date.  The parties reserve the right to modify or supplement the instructions in response to subsequent Court rulings and/or another party's attempts to introduce different or additional issues or theories.]

## TABLE OF CONTENTS

I.  GENERAL ...................................................................................................................3
    A.  INTRODUCTION ..............................................................................................3
    B.  JURORS' DUTIES .............................................................................................4
    C.  EVIDENCE DEFINED .......................................................................................5
    D.  DIRECT AND CIRCUMSTANTIAL EVIDENCE ...............................................6
    E.  CONSIDERATION OF EVIDENCE ....................................................................7
    F.  CREDIBILITY OF WITNESSES ........................................................................8
    G.  EXPERT WITNESSES .......................................................................................9
    H.  DEPOSITION TESTIMONY .............................................................................10
    I.  REMOTE TESTIMONY ...................................................................................11
    J.  USE OF NOTES ..............................................................................................12
    K.  BURDENS OF PROOF .....................................................................................13

II.  PATENT JURY INSTRUCTIONS ...............................................................................15
    A.  THE CLAIMS OF A PATENT ..........................................................................16
    B.  INFRINGEMENT – GENERALLY.....................................................................21
    C.  DIRECT, LITERAL INFRINGEMENT ..............................................................22
    D.  DIRECT INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS....................................................................................................24
    E.  INDUCED INFRINGEMENT ............................................................................26
    F.  CONTRIBUTORY INFRINGEMENT .................................................................28
    G.  WILLFUL INFRINGEMENT .............................................................................30
    H.  INVALIDITY – GENERALLY ..........................................................................31
    I.  PRIOR ART – GENERALLY ............................................................................32
    J.  EFFECTIVE FILING DATE OF '597 PATENT .................................................33
    K.  PRIOR ART AND THE '810 PATENT..............................................................34
    L.  PRIOR ART AND THE '597 PATENT..............................................................36
    M.  PERSON OF ORDINARY SKILL IN THE ART.................................................40
    N.  ANTICIPATION ...............................................................................................41
    O.  OBVIOUSNESS ...............................................................................................42
    P.  INVALIDITY – WRITTEN DESCRIPTION .......................................................45

III.  DAMAGES...................................................................................................................47
    A.  DAMAGES – GENERALLY..............................................................................47
    B.  DAMAGES – KINDS OF DAMAGES................................................................49

| | | |
|---|---|---|
| C. | LOST PROFITS – "BUT FOR" TEST | 50 |
| D. | LOST PROFITS – DEMAND | 51 |
| E. | LOST PROFITS – NON-INFRINGING SUBSTITUTES- ACCEPTABLE NON-INFRINGING SUBSTITUTE PRODUCTS | 52 |
| F. | LOST PROFITS – NONINFRINGING SUBSTITUTES – AVAILABILITY | 53 |
| G. | LOST PROFITS –CAPACITY | 54 |
| H. | LOST PROFITS – AMOUNT OF PROFIT | 55 |
| I. | LOST PROFITS – MARKET SHARE | 56 |
| J. | REASONABLE ROYALTY | 57 |
| K. | REASONABLE ROYALTY – RELEVANT FACTORS TO THE HYPOTHETICAL NEGOTIATION | 59 |
| L. | REASONABLE ROYALTY – ATTRIBUTION / APPORTIONMENT | 62 |
| M. | REASONABLE ROYALTY – TIMING | 63 |
| N. | REASONABLE ROYALTY – AVAILABILITY OF NON-INFRINGING SUBSTITUTES | 64 |
| O. | REASONABLE ROYALTY – USE OF COMPARABLE LICENSE AGREEMENTS | 65 |
| IV. | DELIBERATIONS AND VERDICT | 66 |
| A. | DELIBERATION AND VERDICT – INTRODUCTION | 66 |
| B. | UNANIMOUS VERDICT | 67 |
| C. | DUTY TO DELIBERATE | 68 |
| D. | COURT HAS NO OPINION | 69 |

## I.   <u>GENERAL</u>

### A.   INTRODUCTION

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case. Each of you has been provided a copy of these instructions. You may read along as I deliver them if you prefer.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating testimony and evidence. Then I will explain the positions of the parties and the law you will apply in this case. Then we will hear the closing arguments. After that, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

### B.    JURORS' DUTIES

You have two main duties as jurors. The first is to decide what the facts are from the evidence that you saw and heard in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way. You are the sole judges of the facts.

Your second duty is to take the law that I give you, apply it to the facts, and decide under the appropriate burden of proof which party should prevail on any given issue. It is my job to instruct you about the law, and you are bound by the oath you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not guess or speculate, and do not let any bias, sympathy, or prejudice you may feel toward one side or the other influence your decision in any way.

## C.      EVIDENCE DEFINED

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, including deposition transcript testimony that has been played by video or read to you, the exhibits that I allowed into evidence, and the stipulations to which the lawyers agreed.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts. Their questions and objections are not evidence. My legal rulings are not evidence. You should not be influenced by a lawyer's objection or by my ruling on that objection. Any of my comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And, sometimes I may have ordered you to disregard things that you saw or heard, or that I struck from the record. You must ignore all of these things. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way. Make your decision based only on the evidence, as I have defined it here, and nothing else.

**D.      DIRECT AND CIRCUMSTANTIAL EVIDENCE**

During the preliminary instructions, I told you about "direct evidence" and "circumstantial evidence." I will now remind you what each means.

Direct evidence is simply evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact. If a witness testified that he saw it raining outside, and you believe him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence.  You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

**E.      CONSIDERATION OF EVIDENCE**

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

## F.     CREDIBILITY OF WITNESSES

You are the sole judges of each witness's credibility. You may believe everything a witness says, or part of it, or none of it. You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there is evidence tending to prove that the witness testified falsely about some important fact or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony he or she gave at the trial in person or by deposition testimony played by video or read to you. You have the right to distrust such witness's testimony and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

### G.    EXPERT WITNESSES

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business. This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case.

## H.    DEPOSITION TESTIMONY

During the trial, certain testimony was presented to you by playing the video excerpts or reading from a deposition. The deposition testimony may have been edited or cut to exclude irrelevant testimony as the parties have only a limited amount of time to present you with evidence. You should not attribute any significance to the fact that the depositions may appear to have been edited. Deposition testimony is out of court testimony given under oath and is entitled to the same consideration you would give it had the witnesses personally appeared in court.

## I.      REMOTE TESTIMONY

During the trial, certain witnessed testified live by remote means due to travel restrictions related to the Covid-19 pandemic. You should not attribute any significance to the fact that these witnesses did not appear live in the Courtroom.  These witnesses were under oath just as any other witness, and their testimony and is entitled to the same consideration you would give it had the witnesses personally appeared in court.

**J.       USE OF NOTES**

You may have taken notes during trial to assist your memory. As I instructed you at the beginning of the case, you should use caution in consulting your notes. There is generally a tendency to attach undue importance to matters which one has written down. Some testimony which is considered unimportant at the time presented, and thus not written down, takes on greater importance later in the trial in light of all the evidence presented. Therefore, your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence.

Your notes are not evidence and are by no means a complete outline of the proceedings or a list of the highlights of the trial. Above all, your memory should be the greatest asset when it comes time to deliberate and render a decision in this case.

**K.      BURDENS OF PROOF**

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof." In a patent case such as this, there are two different burdens of proof. The first is called "preponderance of the evidence." The second is called "clear and convincing evidence." I told you about these two standards of proof during my preliminary instructions to you and I will now remind you what they mean.

As you know, the Plaintiffs in this case are ArcherDX, LLC and the General Hospital Corporation, doing business as Massachusetts General Hospital. I may refer to them collectively as "Plaintiffs" in these instructions. I may also refer to them individually as "Archer" and "MGH," respectively. Plaintiffs have sued the Defendants, QIAGEN Sciences, LLC, QIAGEN LLC, QIAGEN Beverly, LLC, QIAGEN Gaithersburg, Inc., QIAGEN GmBH, and QIAGEN N.V.. I may refer to them collectively as "QIAGEN or Defendants" in these instructions.

The Plaintiffs have accused QIAGEN of infringing claims of two patents. The Defendants deny those claims. The Defendants claim that the asserted patent claims in this case are invalid.

The Plaintiffs have the burden of proving their claims and the amount of monetary damages by a preponderance of the evidence. This means the Plaintiffs have to produce evidence which, when considered in light of all the facts, leads you to believe that what Plaintiffs claim is more likely true than not. To put it differently, if you were to put the Plaintiffs' and the Defendants' evidence on the opposite sides of the scale, the evidence supporting Plaintiffs' claims would have to make the scales tip somewhat to their side. If the scale should remain equal or tip in favor of the Defendants, you must find for the Defendants.

In addition to denying Plaintiffs' claims that they infringe, the Defendants assert that all of the asserted patent claims are invalid. The Defendants have the burden of proving that the asserted claims are invalid and have to do so by clear and convincing evidence. Clear and convincing evidence is evidence that persuades you that what Defendants seek to prove is highly probable.   Proof by clear

11

and convincing evidence is thus a higher burden of proof than proof by a preponderance of the evidence.

You may have heard of the "beyond a reasonable doubt" burden of proof from criminal cases. That requirement is the highest burden of proof in our judicial system. It applies in criminal cases, but does not apply to civil cases, like this one, and, therefore, you should put it out of your mind.

## II.  PATENT JURY INSTRUCTIONS

Plaintiffs contend that QIAGEN infringes, under the doctrine of equivalents, the methods claimed in claims 16, 17, and 19 of its '810 patent by using, and inducing its customers to use, QIAseq Targeted DNA Panels, QIAseq Targeted RNAscan Panels, QIAseq Immune Repertoire RNA Library Kits, and QIAseq Index Kits for the Illumina platform, and contributes to its customers' infringement.

Plaintiffs also contend that QIAGEN infringes, literally, the methods claimed in claims 1, 5, and 19 of the '597 patent by using, and inducing its customers to use, QIAseq Targeted DNA Panels, QIAseq Targeted RNAscan Panels, QIAseq Immune Repertoire RNA Library Kits, and QIAseq Index Kits for the Illumina and Ion Torrent platforms, and GeneRead QIAact Kits, and contributes to its customers' infringement.

QIAGEN denies that it has infringed the asserted claims of the '810 and '597 patents and contends that the asserted claims are invalid on various grounds.

Your job is to decide whether QIAGEN has infringed each of the asserted claims of the '810 and '597 patents and whether each asserted claim is invalid. You will also need to make a finding as to whether any infringement was willful.

A.    THE CLAIMS OF A PATENT

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims." The patent claims are the numbered sentences at the end of a patent.  The claims describe the invention and describe what the patent owner may prevent others from doing.

Here, you will need to understand what each of the asserted claims of the '810 and '597 patents cover in order to decide whether or not that claim is infringed and to decide whether or not that claim is invalid.

Patent claims may exist in two forms, referred to as independent claims or dependent claims. An independent claim does not refer to any other claim of the patent. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. For example, claim 16 of the '810 patent is an independent claim.

A dependent claim refers to at least one other claim in the patent. A dependent claim includes each of the limitations of the other claims or claims to which it refers, as well as the additional limitations of the dependent claim itself. Therefore, to determine what a dependent claim covers, it is necessary to look at both the dependent claim and the other claim or claims to which it refers. For example, claim 17 of the '810 patent is a dependent claim. To determine what dependent claim 17 of the '810 patent covers, the words of that claim and the words of independent claim 16 of the '810 patent must be read together.

The law says that it is my job as a judge to define the terms of the claims and to instruct you about the meaning. It is your role to apply my definitions to the issues that you are asked to decide. In this case, I have determined the meaning of the following terms of the asserted claims of the '810 Patent:

- "universal oligonucleotide tail adaptor" means "a nucleic acid molecule comprised of two strands (a blocking strand and an amplification strand) and comprising a first ligatable duplex end and a second unpaired end";

- "blocking strand" means "a strand of the universal oligonucleotide tail adaptor that comprises a 5' duplex portion";

- "amplification strand" means "a strand of the universal oligonucleotide tail adaptor that comprises an unpaired 5' portion, a 3' duplex portion, and a 3' T overhang, and nucleic acid sequences identical to a first and second sequencing primers";

- "second target-specific primer" means "a single-stranded oligonucleotide comprising a 3' portion comprising a nucleic acid sequence that can specifically anneal to a portion of the known target nucleotide sequence comprised by the amplicon resulting from step [ii] and a 5' portion comprising a nucleic acid sequence that is identical to a second

sequencing primer." [1]   **[[PLAINTIFFS' PROPOSAL:** The second target-specific primer does not need to be nested with respect to the first target-specific primer.**]]**[23]

- "known target nucleotide sequence" means "a portion of a target nucleic acid for which the sequence (e.g. the identity and order of the nucleotide bases comprising the nucleic acid) is known";

- "second adaptor primer" means "a nucleic acid molecule comprising a nucleic acid sequence identical to a portion of the first sequencing primer and is nested with respect to the first adaptor primer"; and

---

[1] The Markman order identified this step as "step (b)."  The parties have agreed that step (b) in this definition is the same as step "(ii)" in the claim.

[2] Plaintiffs' proposal is consistent with the Court's ruling on Plaintiffs' Motion in Limine No. 1.  *See* 8/16/2021 Hearing Tr. at 79:6-16 ("You cannot say that the patent is limited to nesting . . .[Y]ou cannot argue that it's limited to that.").  *See also* D.I. 146 at 11:

> As to Defendants' proposal, I do not find that it is clear that the language they propose to add is part of the lexicography for the term. That this is not part of the definition is consistent with the prosecution history where the Patent Examiner referenced the "explicit" definition of "second target-specific primer," [in the June 7, 2017 Office Action at page 3,] and she did not include the "nesting requirement" that Defendants now propose.
> Similarly, in the Notice of Allowability of the parent application, the Examiner referred to the definition of "second target-specific primer" as requiring "a 3' target-specific portion and a 5' portion comprising a nucleic acid sequence that is identical to a second sequencing primer." [Notice of Allowance at page 8]. Again, there is no requirement for nesting recognized by the Examiner as part of the construction. Moreover, "nesting" is specifically included in claim 1, but is not included in claim 16. In the absence of a clear reason to do so, which I have not seen, **<u>I will not read into the claim a term that the patentee chose not to include.</u>**

(emphasis added).

[3]  QIAGEN's Proposal is the Court's construction without additions.  D.I. 146 at 2; *see also* D.I. 435 (Aug. 11, 2021 Hr'g Tr.) at 25:6-11. QIAGEN objects to the inclusion of Plaintiffs' additional language.

- "nested" means "annealed to a nucleic acid sequence 3' downstream and in the same direction as another molecule."

**[[QIAGEN:** In light of the hearing on August 16, 2021, QIAGEN objects to the foregoing constructions offered by themselves and proposes the following additions:

- A "sequencing primer" is a primer used to obtain the identity of a base rather than just any primer used generally on the sequencing platform;

- "A nucleic acid sequence identical to a second sequencing primer" in the "second target-specific primer" must have the exact same number of bases and the exact same base at each position as the second sequencing primer; and

- For one primer to "anneal[] to a nucleic acid sequence 3' downstream and in the same direction" as a second primer (i.e., they are nested), the first primer must have sequence that the second primer does not have.**]][4]

I have also determined the meaning of the following terms of the asserted claims of the '597 Patent:

- "the same sequence" means "the identical sequence";

- "double-stranded target nucleic acid" means "a target nucleic acid comprising a first strand and a second strand that are complementary to each other and hybridized to each other but that may have 3' or 5' overhangs or tails";

---

[4]    Plaintiffs' position is that these additions are improper.  The Court has already issued its decisions on claim construction in this case (*see* D.I. 146 (Dec. 12, 2019); D.I. 254 (Jun. 18, 2020)) and has provided aditional construction only of "second target-specific primer" in claim 16 of the '810 patent (*see* D.I. 447 at 1 (Aug. 21, 2021)).
       QIAGEN objects to the jury instructions on the basis of these unresolved issues of claim construction, as is required to preserve its objection.

- "target nucleic acid" means "a nucleic acid molecule of interest (*e.g.*, a nucleic acid to be analyzed)"; **[[PLAINTIFFS' PROPOSAL:** and the target nucleic acid is not limited to genomic DNA;**]]**[5,6]

- "target-specific primer" means "a primer that has a level of complementarity between the primer and the target such that there exists an annealing temperature at which the primer will anneal to and mediate amplification of the target nucleic acid and will not anneal to or mediate amplification of non-target sequences present in a sample";

- "target-specific hybridization sequence" means "a sequence of the target-specific primer that has sufficient complementarity with a sequence of the double-stranded target nucleic acid to enable hybridization between the target-specific primer and a sequence in/of the double-stranded target nucleic acid";

- "plurality of different primers" means "two or more different primers"; and

---

[5] D.I. 254 at 7-9.

> The second disputed term is "target nucleic acid," also in claims 1, 3, 11, 25 through 27, and 29. Plaintiffs propose the construction "a nucleic acid molecule of interest (e.g., a nucleic acid to be analyzed)." Defendants' proposal includes all of Plaintiffs' proposal and then adds to the end: "which is a genomic nucleic acid molecule or cDNA molecule."
> Here, I agree with Plaintiffs and will construe the term to mean "a nucleic acid molecule of interest (e.g., a nucleic acid to be analyzed)."
> …
> The third disputed term is "target-specific primer" in claims 1, 14, 19, and 21. During the argument today, Plaintiffs agreed that the "target-specific primer" must target the "target nucleic acid" and that Defendants' construction is correct if "target nucleic acid" is not limited to genomic DNA. **In my construction of "target nucleic acid," I declined to read in the limitation that the target nucleic acid must be "a genomic nucleic acid molecule or cDNA molecule."** Thus, I understand that Plaintiffs agree to the construction advocated by Defendants and I will adopt that.

(emphasis added).

[6] QIAGEN's Proposal is the Court's construction without additions. D.I. 254 at 1; *see also* D.I. 435 (Aug. 11, 2021 Hr'g Tr.) at 25:6-11. QIAGEN objects to the inclusion of Plaintiffs' additional language.

- "a sequence that is characteristic of the target-specific primer" means "a sequence from one of the strands of the single target nucleic acid recited in step (a)."

**[[QIAGEN:** In light of the hearing on August 16, 2021, QIAGEN objects to the foregoing constructions offered by themselves and proposes the following additions:

- The "double-stranded target nucleic acid" is a starting molecule that has two strands, regardless of which step you begin with, and it must be the same molecule in the first step, the second step, and all other instances where "the double-stranded target nucleic acid" appears;

- The "target-specific primer" is designed to anneal (i.e., bind) to sequence in the double-stranded target nucleic acid that exists before any steps are performed, rather than sequence that is added to the double-stranded target nucleic acid; and

- The "target specific hybridization sequence" must be designed to hybridize (i.e., bind) to sequence that is present in the double-stranded target nucleic acid that exists before any steps are performed, as opposed to some other sequence in a template.

QIAGEN also objects to the foregoing constructions regarding the terms below and proposes the following:[7]

- The term "target nucleic acid" means "a nucleic acid molecule of interest, which is a genomic nucleic acid molecule or cDNA molecule"; and

- The term "double-stranded target nucleic acid" means "a target nucleic acid consisting of a first strand and a second strand that are complementary to each other."]][8]

---

[7]    QIAGEN objects to the proposed instructions to preserve all rights.

[8]    Plaintiffs' position is that these additions are improper.  The Court has already issued its decisions on claim construction in this case (*see* D.I. 146 (Dec. 12, 2019); D.I. 254 (Jun. 18, 2020)) and has provided aditional construction only of "second target-specific primer" in claim 16 of the '810 patent (*see* D.I. 447 at 1 (Aug. 21, 2021)).

QIAGEN objects to the jury instructions on the basis of these unresolved issues of claim construction, as is required to preserve its objection.

You must accept my definition of these words as being correct. It is your job to take these definitions and apply them to the issues that you are deciding, including the issues of infringement and invalidity.

For any words in the claim for which I have not provided you with a definition, you should apply their ordinary meaning in the field of the patents. You should not take my definition of the language of the claims as an indication that I have a view regarding how you should decide the issues that you are being asked to decide, such as infringement and invalidity. These issues are yours to decide.

**B.      INFRINGEMENT – GENERALLY**

Plaintiffs allege that QIAGEN has directly and indirectly infringed the methods claimed in the asserted claims of the '810 and '597 patents. The United States' patent law gives the owner of a valid patent the right to exclude others from importing, making, using, offering to sell, or selling the patented product or method in the United States during the term of the patent. Any person or company that has engaged in any of those acts without the patent owner's permission infringes the patent.

In order to prove infringement, Plaintiffs must prove that the requirements for direct and indirect infringement are met by a preponderance of the evidence, *i.e.*, that it is more likely than not that all of the requirements of direct and indirect infringement have been proved.  Infringement is assessed on a claim-by-claim basis.

Thus, Plaintiffs bear the burden of proving by a preponderance of the evidence that each of the asserted claims is infringed. Therefore, you, the jury, must determine infringement for each patent and each claim separately.

I will now explain each type of infringement in more detail.

## C.    DIRECT, LITERAL INFRINGEMENT

There are two types of "direct infringement": (1) "literal infringement" and (2) "infringement under the doctrine of equivalents."  In this case, you are being asked to determine whether Plaintiffs have proven literal infringement of the '597 patent only.  **[[QIAGEN's PROPOSAL**:  The Court previously determined that QIAGEN does not literally infringe the asserted claims of the '810 patent, and we will discuss the law with respect to infringement of the '810 patent under the doctrine of equivalents next.**]]**[9]

In order to prove direct infringement by literal infringement, Plaintiffs must prove by a preponderance of the evidence, *i.e.*, that it is more likely than not, that QIAGEN used in the United States, a method that meets all of the requirements of a claim.

You must determine, separately for each asserted claim of the '597 patent only, whether or not there is infringement. There is one exception to this rule. If you find that a claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers directly or indirectly to that claim. On the other hand, if you find that an independent claim has been infringed, you must still separately decide whether the accused methods meet additional requirements of any claims that depend from the independent claim to determine whether the dependent claims have also been infringed. Remember, a dependent claim includes all the requirements of any of the claims to which it refers plus additional requirements of its own.

You must compare the accused methods with each asserted claim of the '597 patent to determine whether each and every one of the requirements of that claim is satisfied. When performing

---

[9]     Plaintiffs' position is that this addition is argumentative and adds unnecessary complication by discussing the '810 patent.
    QIAGEN's position is that the jury has already been told of the ruling in openings.  QIAGEN seeks to make clear at the beginning of this instruction which patent this section applies to, and avoid confusion.

this comparison, you should be careful not to compare the accused QIAGEN products with Archer's products or the descriptions in the '597 patent.

The presence of additional steps in an accused method does not mean that the method does not infringe a patent claim. Whether or not QIAGEN's method represents an improvement either over the patent claims or over another method is not relevant to whether or not QIAGEN infringes Plaintiffs' asserted patent claims. As long as QIAGEN performs all of the steps of an asserted patent claim, then that patent claim is infringed by QIAGEN even if that method also has additional steps.

You may find direct infringement based on one instance of the claimed method being performed by QIAGEN. Proof of direct infringement may be based on circumstantial evidence.

Whether or not QIAGEN knew that what it was doing was an infringement does not matter. An entity can be a direct infringer of a patent even if it believes in good faith that it is not infringing any patent or even if it does not know of the patent.

A patent claim is literally infringed only if QIAGEN performs in the United States, each and every step recited in that patent claim. If QIAGEN's method does not contain one or more steps recited in a claim, QIAGEN does not literally infringe that claim.

### D. DIRECT INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS

If someone uses a method that does not literally meet all of the requirements of a claimed method and thus does not literally infringe that claim, there can still be direct infringement if that method satisfies that claim under the "doctrine of equivalents." Here, Plaintiffs contend that QIAGEN infringes claims 16, 17, and 19 of the '810 patent **[[QIAGEN's PROPOSAL:** only**]]**[10] under the "doctrine of equivalents."

Under the doctrine of equivalents, a method infringes a claim if the accused method performs steps corresponding to each and every requirement of the claim that is equivalent to, even though not literally met by, the accused method. You may find that a step is equivalent to a requirement of a claim that is not met literally if a person having ordinary skill in the field of technology of the patent would have considered the differences between them to be "insubstantial" or would have found that the action: (1) performs substantially the same function and (2) works in substantially the same way (3) to achieve substantially the same result as the requirement of the claim.

In deciding whether a claim element and the method step are equivalents, you may consider whether, at the time of the alleged infringement, persons of ordinary skill in the field would have known of the interchangeability of the method step with the claimed element. However, known interchangeability between the claim element and the method step of the method is not necessary to find infringement under the doctrine of equivalents.

In order to prove infringement by "equivalents," Plaintiffs must prove the equivalency of the actions to a claimed step by a preponderance of the evidence. [**QIAGEN'S PROPOSED ADDITION:**

---

[10] Plaintiffs' reserve all rights with respect to the constructions leading to the partial summary judgment with regard to literal infringement in the August 21, 2021 Memorandum Order, D.I. 447.

"As with direct literal infringement, the steps of the method must be performed in the United States for there to be infringement."][11]

---

[11]     This instruction articulates the rule as explained in *Microsoft Corp. v. AT &T Corp.*, 550 U.S. 437 (2007); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, 711 F.3d 1348 (Fed, Cir. 2013); 35 U.S.C. § 284; *Meyer Intellectual Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1371 (Fed. Cir. 2012); *Cardiac Pacemakers, Inc. v. St Jude Med., Inc.* 576 F.3d 1348, 1364 (Fed. Cir. 2009) (en banc); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299 (Fed. Cir. 2006); *NTP, Inc. v. Rsch. In Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005); *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306 (Fed. Cir. 2003); *Joy Techs. Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993); *Standard Havens Products, Inc. v. Gencor Indus. Inc.*, 953 F.2d 1360 (Fed. Cir. 1991).

## E.    INDUCED INFRINGEMENT

Plaintiffs also accuse QIAGEN of actively inducing QIAGEN's customers to directly infringe Plaintiffs' patents, either literally or under the doctrine of equivalents. To find that QIAGEN actively induced its customers to infringe, Plaintiffs must prove by a preponderance of the evidence first that (1) QIAGEN's customers directly infringe the asserted claims, namely, QIAGEN's customers perform in the United States, all of the steps of the asserted claims, and second that (2) QIAGEN actively induced these acts of infringement by QIAGEN customers.  As with direct infringement, you must determine whether there has been inducement on a claim-by-claim basis.

To prove active inducement, Plaintiffs must establish that it is more likely than not that:

1.    QIAGEN aided, instructed, or otherwise acted with the intent to cause acts by QIAGEN customers that would constitute direct infringement of the patent;

2.    QIAGEN knew of the patent, or showed willful blindness to the existence of the patent, at that time;

3.    QIAGEN knew, or showed willful blindness, that the actions of QIAGEN's customers would infringe at least one claim of the patent; and

4.    QIAGEN's customers infringed at least one patent claim.

To find willful blindness (1) QIAGEN must have itself  believed that there was a high probability that a patent existed covering the accused method, and (2) QIAGEN took deliberate actions to avoid learning of the patent.

### F.    CONTRIBUTORY INFRINGEMENT

Plaintiffs also assert that QIAGEN has contributed to infringement by another person by selling, offering for sale, or importing into the United States QIAseq Index Kits.

To find contributory infringement, you must find that someone other than QIAGEN has directly infringed a claimed invention of the patent.  **[[QIAGEN's PROPOSAL:**  As before, such infringement must occur within the United States.]]**[12,13]**

To establish contributory infringement, Plaintiffs also must prove that it is more likely than not that QIAGEN had knowledge of both the patent and direct infringement of that patent. Plaintiffs must prove that each of the following is more likely than not:

1.      someone other than QIAGEN has directly infringed the asserted claims of the '810 and '597 patents;

2.      QIAGEN sold, offered for sale, or imported within the United States a component (*e.g.*, QIAseq Index Kits) of the infringing product for use in the infringing method;

3.      the component is not a staple article or commodity of commerce capable of substantial non-infringing use;

4.      the component constitutes a material part of the claimed invention; and

5.      QIAGEN knew that the component was especially made or adapted for use in an infringing method.

---

[12]     This instruction articulates the rule as explained in *Microsoft Corp. v. AT &T Corp.*, 550 U.S. 437 (2007); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, 711 F.3d 1348 (Fed, Cir. 2013); 35 U.S.C. § 284; *Meyer Intellectual Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1371 (Fed. Cir. 2012); *Cardiac Pacemakers, Inc. v. St Jude Med., Inc.* 576 F.3d 1348, 1364 (Fed. Cir. 2009) (en banc); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299 (Fed. Cir. 2006); *NTP, Inc. v. Rsch. In Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005); *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306 (Fed. Cir. 2003); *Joy Techs. Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993); *Standard Havens Products, Inc. v. Gencor Indus. Inc.*, 953 F.2d 1360 (Fed. Cir. 1991).
[13]     Plaintiffs' position is that this statement is argumentative and redundant.  The section has already specified "selling, offering for sale, or importing into the United States QIAseq Index Kits" in the first line. and mentions "within the Unites States" again at paragraph 2, below.

A "staple article or commodity of commerce capable of substantial non-infringing use" is something that has uses other than as a part or component of the patented product or in the patented method, and those other uses are not occasional, farfetched, impractical, experimental, or hypothetical.

QIAGEN's knowledge that the component was especially made or adapted for use in an infringing product or method may be shown with evidence of willful blindness where QIAGEN consciously ignored the existence of both the patent and direct infringement of that patent. To find willful blindness (1) QIAGEN must have subjectively believed that there was a high probability that a patent existed covering the accused product or method, and (2) QIAGEN must have taken deliberate actions to avoid learning of the patent.

### G.   WILLFUL INFRINGEMENT

If you find that it is more likely than not that QIAGEN infringed a valid claim of Plaintiffs'

patents, either literally or under the doctrine of equivalents, then you must also determine whether or

not QIAGEN's infringement was willful.

To show that QIAGEN's infringement was willful, Plaintiffs must prove by a preponderance

of the evidence that QIAGEN knew of Plaintiffs' patents and intentionally infringed at least one

asserted claim of the patent. For example, you may consider whether QIAGEN's behavior was

malicious, wanton, deliberate, consciously wrongful, flagrant, or in bad faith. However, you may not

find that QIAGEN's infringement was willful merely because QIAGEN knew about the patent,

without more. In determining whether Plaintiffs have proven that QIAGEN's infringement was

willful, you must consider all of the circumstances and assess QIAGEN's knowledge at the time the

challenged conduct occurred.

**[[QIAGEN'S PROPOSAL:** To determine whether QIAGEN acted willfully, consider all

the facts and assess QIAGEN's knowledge and actions at the time of the challenged conduct. Facts

that may be considered include, but are not limited, to:

1.      whether QIAGEN had knowledge of Plaintiffs' issued patents before Plaintiffs sued

QIAGEN;

2.      whether or not QIAGEN acted consistently with the standards of behavior for its

industry;

3.      whether or not QIAGEN intentionally copied an Archer product that is covered by

the asserted patents;

4.      whether or not QIAGEN reasonably believed it did not infringe or that the patent was

invalid; and

5.      whether QIAGEN knew, or should have known, that its conduct involved an

unreasonable risk of infringement.

29

Consider all the facts to determine whether QIAGEN acted willfully. You must find that QIAGEN knew about the patents before Plaintiffs brought the lawsuit on the patents to determine that QIAGEN acted willfully.**]]**[14],[15]

If you determine that any infringement was willful, you may not allow that decision to affect the amount of any damages award you give for infringement.

---

[14]     QIAGEN's Source: adapted from *TrustID, Inc. v. Next Caller Inc.*, C.A. No. 1:18-cv-00172-MN (July 16, 2021), D.I. 295.  The objected-to statement regarding QIAGEN's knowledge was provided to the jury in *TrustID*.  For additional support of this requirement, *see also, Med. Univ. of S.C. Found. for Rsch. Dev. v. AstraZeneca Pharms. LP*, No. CV 2:13-2078-SB, 2013 WL 11258965, at *1 (D.S.C. Dec. 9, 2013); *Radware, Ltd. v. A10 Networks, Inc.*, No. C-13-02021-RMW, 2013 WL 5373305, at *6 (N.D. Cal. Sept. 24, 2013).

[15]     Plaintiffs' position is that QIAGEN's proposal is unnecessary and may confuse the jury.  The parties were in agreement as to the willful infirngment instruction originally submitted to the Court.  *See* D.I. 430 at 31 (Aug. 8, 2021).  The instruction does not appear to be found in any model rule.  Further, the instruction that "You must find that QIAGEN knew about the patents before Plaintiffs brought the lawsuit on the patents to determine that QIAGEN acted willfully" is misleading.  The amended complaint in this action was filed October 30, 2019, more than a year after the filing of the complaint by which time, at least, Qiagen had knowledge of the patent.  *Compare* Complaint, D.I. 1 (filed July 10, 2018) to Amended Complaint, D.I. 130 (filed October 30, 2019); *see Zond, Inc. v. Fujitsu Semiconductor Ltd.*, 990 F. Supp. 2d 50, 58 (D. Mass. 2014) ("Whilst the original pleading could not have satisfied the knowledge requirement, as [plaintiff] has amended its complaint, Fujitsu's post-complaint knowledge of the patents-in-suit and their use by [defendant] properly may be inferred.").  Moreover, pre-suit willful blindness to a plaintiffs' patent rights may support a willfulness finding.  *See Corephotonics, Ltd. v. Apple, Inc.*, No. 17-06457-LHK, 2018 WL 4772340, at *9 (N.D. Cal. Oct. 1, 2018); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011).

### H.      INVALIDITY – GENERALLY

I will now instruct you on the rules you must follow in deciding whether or not QIAGEN has proven that the asserted claims of the '810 and '597 patents are invalid. To prove that a claim of a patent is invalid, QIAGEN must persuade you by clear and convincing evidence, *i.e.*, you must be left with a clear conviction that the claim is invalid.

Like infringement, you must determine whether each of Plaintiffs' Asserted Claims is invalid on a claim-by-claim basis. For example, even if an independent claim is invalid, this does not mean that the dependent claims that depend from it are automatically invalid. However, if you find that a dependent claim is invalid, then you must find that the independent claim from which it depends is also invalid.

## I.      PRIOR ART – GENERALLY

In order for someone to be entitled to a patent, the invention must actually be "new" and not obvious over what came before, which is referred to as the prior art. Prior art is considered in determining whether the asserted claims of the '810 and '597 patents are anticipated or obvious.   Prior art may include items that were publicly known or that have been used or offered for sale, or references, such as publications or patents, that disclose the claimed invention or elements of the claimed invention.

**J.      EFFECTIVE FILING DATE OF '597 PATENT**

The inventors of the '597 patent filed a "provisional" patent application on January 27, 2014. You must determine whether the asserted claims of the '597 patent are sufficiently supported by the provisional application. Plaintiffs contend that the asserted claims of the '597 patent are entitled to the filing date of the provisional application, while QIAGEN contends that the asserted claims are not.

Plaintiffs may rely on the filing date of their provisional application to establish the effective filing date if the application teaches one of ordinary skill in the art to make and use the claimed invention of the '597 patent, and to do so without undue experimentation. Additionally, the provisional application must disclose each and every element of the asserted claims of the '597 patent.

If you determine that Plaintiffs have shown by a preponderance of the evidence that the effective filing date is January 27, 2014, then QIAGEN must prove by clear and convincing evidence that this is not the correct effective filing date.

If you find that Plaintiffs are entitled to an effective filing date that is the same date as the filing date of the provisional application, then January 27, 2014 is the effective filing date of the '597 patent for purposes of validity and the prior art.

## K.    PRIOR ART AND THE '810 PATENT

Prior art to the '810 patent includes any of the following items received into evidence during

trial:

Amsterdam *et al*., Retroviral-mediated insertional mutagenesis in zebrafish, 104: Methods in Cell Biology 59-82 (2011) ("Amsterdam")

Bronner *et al*., Improved protocols for Illumina sequencing, 18 Current Protocols in Human Genetics 2.1, 2.1-2.27 (2009) ("Bronner")

Kircher *et al*., "Double indexing overcomes inaccuracies in multiplex sequencing on the Illumina platform." 40 Nucleic acids research e3:1-8 (2011) ("Kircher")

Siebert *et al*., An improved PCR method for walking in uncloned genomic DNA, 23 Nucleic Acids Research 1087, 1087-88 (1995) ("Siebert")

Wu *et al*., Transcription start regions in the human genome are favored targets for MLV integration," Science 2003; 300:1749-51 ("Wu").

### L.     PRIOR ART AND THE '597 PATENT

**[[PLAINTIFFS' PROPOSAL:**

You must determine whether the references asserted by QIAGEN are prior art that can be considered in determining whether the asserted claims of the '597 patent are anticipated or obvious. Plaintiffs contend that APAgene Manual  and the '461 Publication are not prior art.  QIAGEN must prove by clear and convincing evidence that these references are prior art.

QIAGEN contends that APAgene Manual is prior art because it was published or otherwise made available to the public before the filing date of the '597 patent.  An invention is known when the information about it was reasonably accessible to the public on that date.

QIAGEN contends that the the '461 Publication is prior art because it is a published patent application that names another invention that was filed before the filing date of the '597 patent.

You may not find that the'461 Publication is prior art if it is an item or publication that (a) is the inventor's own work or (b) describes the inventor's own work or (c) was directly or indirectly obtained from the inventor, unless it was made public more than one year before the filing date of the patent's application.]][16]

**[[QIAGEN PROPOSAL:**

Prior art to the '597 patent includes any of the following items received into evidence during trial:

1.      anything that was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public anywhere in the world before the effective filing date of claims 1, 5, or 19 of the '597 patent; and

2.      anything that was described in a patent, or in an application for patent published or deemed published, in which the patent or application names another inventor and was filed before the effective filing date of claims 1, 5, or 19 of the '597 patent.

---

[16] Plaintiffs' source:  Federal Circuit Bar Association Model Patent Jury Instructions § 4.3a-3 (2020).

Exceptions to Prior Art:

1. A disclosure made one year or less before the effective filing date of the current claim(s) shall not be prior art to the asserted claims of the '597 patent if the disclosure was made by the inventor or joint inventor named in the current patent or by another person who obtained the subject matter disclosed directly or indirectly from such inventor.

2. A disclosure shall not be prior art to the asserted claims of the '597 patent if the subject matter disclosed was obtained directly or indirectly from the inventor or joint inventor named in the '597 patent.]][17]

**[[JOINT PROPOSAL (with exceptions noted):**

In this case, QIAGEN contends that the following items are prior art to the '597 patent:

Bio S&T Inc., APAgene™ GOLD-RT genome walking kits (Sept. 2010) ("APAgene Manual")

Cornish-Bowden, A. (1985). Nomenclature for incompletely specified bases in nucleic acid sequences: recommendations 1984. Nucleic acids research, 13(9), 3021 ("Cornish-Bowden")

Fraiture, M. A., Herman, P., Taverniers, I., De Loose, M., Deforce, D., & Roosens, N. H. (2013). An innovative and integrated approach based on DNA walking to identify unauthorised GMOs. Food chemistry, 147, 60-69 ("Fraiture")

Kircher *et al.*, "Double indexing overcomes inaccuracies in multiplex sequencing on the Illumina platform." 40 Nucleic acids research e3:1-8 (2011) ("Kircher")

Martin-Harris, M. H., Bartley, P. A., & Morley, A. A. (2010). Gene walking using sequential hybrid primer polymerase chain reaction. Analytical biochemistry, 399(2), 308-310 ("Martin-Harris")

McCarty, D. R., Latshaw, S., Wu, S., Suzuki, M., Hunter, C. T., Avigne, W. T., & Koch, K. E. (2013). Mu-seq: sequence-based mapping and identification of transposon induced mutations. PLoS One, 8(10), e77172 ("McCarty")

U.S. Patent No. 9,487,828 ("the '828 patent")[18]

---

[17] QIAGEN Source:  AIPLA Model Patent Jury Instruction No. 5.0.2 (2019).

[18]      Plaintiffs object to the inclusion of the '828 Patent in light of the Court's ruling. 8/11/2021 Hearing Tr. at 18:12-16 ("[A]s to 102(b)(2) I don't think there is any dispute that the exception applies other than QIAGEN's argument … that I have already rejected."); *see also* 35 U.S.C. § 102.

QIAGEN submits that the Court's denial of its summary judgment motion does not preclude it from bringing its proof on the '828 patent as prior art at trial.  Specifically, the Court found a fact issue as to whether the '828 patent qualifies as 102(b)(1) prior art.  (8/11/2021 Hearing Tr. at 18:19-

U.S. Patent No. 10,017,810 ("the '810 patent")[19]

U.S. Patent Application Publication No. 2013/0303461 ("the '461 Publication")

---

19:7).  QIAGEN further notes that Plaintiffs' proposal for this instruction improperly omits the '828 patent from QIAGEN's contentions at paragraphs 2 and 3; if Plaintiffs' proposed instructions are adopted, these should be inserted as follows:  "QIAGEN also contents that the '828 and '810 patents are prior art because each was published or otherwise made available to the public before the filing date of the '597 patent."

[19]    Plaintiffs object to the inclusion of the '810 Patent in light of the Court's ruling. 8/11/2021 Hearing Tr. at 18:12-16 ("[A]s to 102(b)(2) I don't think there is any dispute that the exception applies other than QIAGEN's argument … that I have already rejected.")

QIAGEN submits that the Court's denial of its summary judgment motion does not preclude it from bringing its proof on the '810 patent as prior art at trial.  Specifically, the Court found a fact issue as to whether the '810 patent qualifies as 102(b)(1) prior art.  (8/11/2021 Hearing Tr. at 18:19-19:7).  QIAGEN further notes that Plaintiffs' proposal for this instruction omits the '810 patent from QIAGEN's contentions at paragraphs 2 and 3; if Plaintiffs' proposed instructions are adopted, these should be inserted as follows:  "QIAGEN also contents that the '828 and '810 patents are prior art because each was published or otherwise made available to the public before the filing date of the '597 patent."

### M.     PERSON OF ORDINARY SKILL IN THE ART

The question of invalidity of a patent claim is determined from the perspective of a person of ordinary skill in the art in the field of the invention at the time of the named inventors' invention date. Thus, prior art must be evaluated from the perspective of one of ordinary skill in the field of the invention as of the time of invention.

The parties in this case agree that a person of ordinary skill in the art would have had either a M.D./Ph.D. or Ph.D. in molecular biology, molecular genetics, chemistry, engineering, or equivalent disciplines with two years of experience, or a Bachelor of Science in such fields with five years of experience, with such experience including library preparation methods, PCR, and sequencing techniques including both first generation and NGS.

## N.   ANTICIPATION

An invention must be new to be entitled to patent protection under the U.S. patent laws. If a device or process has been previously invented and disclosed to the public, then it is not new, and therefore the claimed invention is "anticipated" by the prior invention. To prove anticipation, QIAGEN must prove that the claimed invention is not new by clear and convincing evidence.

In this case, QIAGEN contends that the asserted claims of the '810 and '597 patents are anticipated. You must determine what is the prior art that may be considered in determining whether the asserted claims of the '810 and '597 patents are new or anticipated.

To anticipate a claim, each element in the claim must be present in a single item of prior art and arranged or combined in the same way as recited in the claim. You may not combine two or more items of prior art to find anticipation. In determining whether every one of the elements of the claimed invention is found in the prior publications and patents identified by QIAGEN, you should consider what a person of ordinary skill in the art would have understood from his or her review of the particular publications and patents.

### O.    OBVIOUSNESS

Even though an invention has not been identically disclosed or described before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of technology of the patent at the time the invention was made.

QIAGEN may establish that a patent claim is invalid by proving, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the pertinent art as of May 10, 2012, for the '810 patent, and as of the effective filing date of the asserted claims for the '597 patent.

In determining whether an asserted claim is obvious, you must consider the level of ordinary skill in the pertinent field that someone would have had at the time the invention was made, the scope and content of the prior art, any differences between the prior art and the asserted claims, and, if present, objective evidence or secondary considerations, which I will describe shortly. The person of ordinary skill in the art is presumed to be aware of all of the pertinent prior art. A person of ordinary skill is also a person of ordinary creativity, not an automaton. Do not use hindsight; consider only what was known at the time of the invention for the '810 patent or the time of the filing date for the '597 patent. **[[QIAGEN'S PROPOSAL:** Common sense teaches, however, that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle. When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of

innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.]][20]

Keep in mind that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks of prior art. In considering whether a claimed invention is obvious, you should consider whether, at the relevant time, there was a reason that would have prompted a person having ordinary skill in the field of the invention to combine the known elements in the prior art in a way the claimed invention does, taking into account such factors as (1) whether the claimed invention was merely the predictable result of using prior art elements according to their known function(s); (2) whether the claimed invention provides an obvious solution to a known problem in the relevant field; (3) whether the prior art teaches or suggests the desirability of combining elements claimed in the invention; (4) whether the prior art teaches away from combining elements in the claimed invention; (5) whether it would have been obvious to try the combinations of elements, such as when there is a design incentive or market pressure to solve a problem and there are a finite number of identified, predictable solutions. To find it rendered the claimed invention obvious, you must find that the prior art provided a reasonable expectation of success.

In determining whether the claimed invention is obvious, you should take into account any objective evidence (sometimes called "secondary considerations") that may shed light on whether or not the claimed invention is obvious, such as;

---

[20]

Plaintiffs' position is that this proposed addition is argumentative and does not relate to the issues in this case. Qiagen's obviousness arguments do not relate to application of common sense to familiar items. *See, e.g., Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1267 (Fed. Cir. 2008) (case involving "complex" subject matter may require expert testimony to show infringement).

QIAGEN's source: *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007).  QIAGEN has presented as a theme of its case the application of the jury's common sense to the issues presented.

a. Whether the claimed invention was commercially successful as a result of the merits of the claimed invention (rather than the result of design needs or market-pressure advertising or similar activities);

b.  Whether others had tried and failed to make the claimed invention;

c.  Whether others copied the claimed invention;

d. Whether the claimed invention satisfied a long-felt need;

e. Whether others invented the claimed invention at roughly the same time;

f. Whether there were changes or related technologies or market needs contemporaneous with the claimed invention;

g. Whether others in the field praised the claimed invention;

h. Whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the claimed invention;

i. Whether the claimed invention achieved unexpected results;

j. Whether others in the field praised the claimed invention;

k. Whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the claimed invention;

l. Whether others sought or obtained rights to the patent from the patent holder; and

m. Whether the inventor proceeded contrary to accepted wisdom in the field.

[[**PLAINTIFFS' PROPSAL:** These factors should be considered along with all the other evidence in the case in determining whether the asserted claims would have been obvious. In considering this kind of evidence, you should consider whether the secondary consideration was

attributable to the features of the asserted claims as opposed to features already found in the prior art.]][21]

[[**QIAGEN'S PROPOSAL**: In determining whether the claimed invention was obvious, consider each claim separately, but understand that if a dependent claim is obvious, then the claims from which it depends are necessarily obvious as well.]][22]

---

[21] Plaintiffs' source: Adapted from *Pacific Biosciences of California, Inc. v. Oxford Nanopore Techs.*, C.A. No. 17-275, D.I. 476 (D. Del. Mar. 17, 2020).
[22] QIAGEN's Source: Federal Circuit Bar Association Model Patent Jury Instructions (2020) (last paragraph, page 51).

### P.  INVALIDITY – INDEFINITENESS

QIAGEN contends that the asserted claims of the '810 and '597 Patents are invalid because the language of the claims is indefinite.  The patent laws have requirements for the way in which patent claims are written.  Patent claims must be sufficiently clear that a person of ordinary skill in the art reading them is able to determine what the claims cover and what they do not cover.  If a patent claim does not meet this requirement, then the claim is said to be indefinite, and the claim is invalid.

The amount of detail required for a claim to be definite depends on the particular invention, the prior art, and the description of the invention contained in the patent.  A patent claim, when read along with the rest of the patent, must reasonably inform those skilled in the art what the patent claims cover.  Simply because claim language may not be precise does not automatically mean that the claim is indefinite.

If you find that a person of ordinary skill in the art would not understand with reasonable certainty what is, and what is not, covered by the asserted claims of the '810 and '597 Patents, you must find those claims invalid.

## Q.      INVALIDITY – WRITTEN DESCRIPTION

QIAGEN contends that the asserted claims of the '810 and '597 patents are invalid for failure to satisfy the written-description requirement. QIAGEN bears the burden of establishing by clear and convincing evidence that the specification fails to satisfy the written-description requirement.

A patent must contain a written description of the method claimed in the patent. The written-description requirement helps ensure that the patent applicant actually invented the claimed subject matter. To satisfy the written-description requirement, the patent specification must describe each and every limitation of a patent claim, in sufficient detail, although the exact words found in the claim need not be used. When determining whether the specification discloses the invention, the claim must be viewed as a whole.

The written description requirement is satisfied if persons of ordinary skill in the field of the invention would recognize, from reading the patent specification, that the inventor possessed the subject matter finally claimed in the patent. **[[QIAGEN'S PROPOSAL:**  Logically, the inventors could  not  have  described  a  knowledge  that  they  did  not  possess.]]** [23]  The written-description

---

[23]

QIAGEN directs the Court to the following authority: *see Boston Scientific Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1360 (Fed. Cir. 2011) (affirming finding of no written description of analogs within the scope of the claims and noting that the district court "concluded that '[l]ogically, the inventors could not have described a knowledge that they did not possess.'  The district court also concluded that 'no reasonable jury could find that the written description requirement has been met with respect to the claimed analogs.'") (citations omitted); *Nuvo Pharms. (Ireland) Designated Activity Co. v. Dr. Reddy's Lab'ys Inc.*, 923 F.3d 1368, 1382 (Fed. Cir. 2019) (distinguishing *Alcon*: "The factual circumstances in *Alcon* are markedly different than the facts presented here.  Unlike the specification of the patent at issue in *Alcon*, the specification of the '907 and '285 patents does not provide any data showing that uncoated PPI is effective in raising the gastric pH of a patient to at least 3.5.  Even though we said in *Alcon* that 'written description is about whether the skilled reader of the patent disclosure can recognize that what was claimed corresponds to what was described' and 'is not about whether the patentee has proven to the skilled reader that the invention works, or how to make it work,' we found that the written description requirement was satisfied at least in part by accelerated stability testing data showing the claimed effect.  Under those circumstances, it was

requirement is satisfied if the specification shows that the inventor possessed his or her invention as of the effective filing date of the claimed invention, even though the claims may have been changed or new claims added since that time.  It is unnecessary to spell out every detail of the invention in the specification, and specific examples are not required; but enough must be included in the specification to convince persons of ordinary skill in the art that the inventor possessed the full scope of the invention. In evaluating whether the specification has provided an adequate written description, you may consider such factors as:

    1.       the nature and scope of the patent claims;

    2.       the complexity, predictability, and maturity of the technology at issue;

    3.       the existing knowledge in the relevant field; and

    4.       the scope and content of the prior art.

The issue of written description is decided on a claim-by-claim basis, not as to the entire patent or groups of claims.

If you find that QIAGEN has proven by clear and convincing evidence that the asserted claims of the '810 or '597 patents do not contain adequate written description for the inventions recited in the asserted claims, then you must find that the claim(s) are invalid.

---

not necessary for the patentee to demonstrate or otherwise 'prove' beyond the data disclosed in the specification that the invention works.  Here, there is no similar hook or disclosure in the specification that an ordinarily skilled artisan can rely on to understand that the inventor possessed effective uncoated PPI.") (citation omitted).

Plaintiffs object to Qiagen's proposal on the ground that it is argumentative, inconsistent with Federal Circuit authority and not included within any model patent jury instructions. Note: *See Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*, 745 F.3d 1180, 1190–91 (Fed. Cir. 2014) ("There is no requirement that the disclosure contain "either examples or an actual reduction to practice"; rather, the critical inquiry is whether the patentee has provided a description that "in a definite way identifies the claimed invention" in sufficient detail that a person of ordinary skill would understand that the inventor was in possession of it at the time of filing.")

## III.   DAMAGES

### A.   DAMAGES – GENERALLY

I will next instruct you on damages. You must not take these instructions as implying my view about which party is entitled to your verdict in this case. Instructions regarding the measure of damages are given for your guidance in the event you find in favor of plaintiffs in the case in accordance with the other instructions.

If you find that use of the accused products, including the QIAseq Targeted DNA Panels (Illumina platform only), QIAseq Targeted RNAscan Panels (Illumina platform), QIAseq Immune Repertoire RNA Library Kits (Illumina platform), and QIAseq Index Kits (Illumina platform) ("the '810 Accused Products"), QIAseq Targeted DNA Panels (Illumina and Ion Torrent platforms), QIAseq Targeted RNAscan Panels (Illumina and Ion Torrent platforms), QIAseq Immune Repertoire RNA Library Kits (Illumina and Ion Torrent platforms), QIAseq Index Kits (Illumina and Ion Torrent platforms), and GeneRead QIAact Kits (collectively, "the '597 Accused Products"), infringes any of the claims of the '597 or '810 Patents, and that those claims are not invalid, you must determine the amount of damages to be awarded to Plaintiffs for the infringement.  On the other hand, if you find that each of the asserted patent claims is either invalid or is not infringed, then you should not consider damages in your deliberations.

Plaintiffs must prove each element of its damages—including the amount of the damages—by a preponderance of the evidence, which means more likely than not.

If proven by Plaintiffs, damages must be in an amount adequate to compensate Archer for the infringement.  The purpose of a damages award is to put Plaintiffs in about the same financial position it would have been in if the infringement had not happened. But the damages award cannot be less than a reasonable royalty. You may not add anything to the amount of damages to punish an accused infringer or to set an example.  You also may not add anything to the amount of damages for interest.

**[[PLAINTIFFS' PROPOSAL:** You should award Plaintiffs damages from the sale of an accused QIAGEN product that is used outside the United States if you find (1) QIAGEN's infringement in the United States was a cause of the sale of that product, and (2) QIAGEN made or sold the product within the United States.**]]**[24]

The fact that I am instructing you on damages does not mean that the Court believes that one party or the other should win in this case. My instructions about damages are for your guidance only in the event you find in favor of the Plaintiffs. You will need to address damages only if you find that one or more of the asserted claims are both not invalid and infringed.

---

[24] Plaintiffs' position is that this instruction is constituent with the Court's rulings and the Federal Circuit precedence. *See* 8/17/2021 Tr. at 89:6-23 ("[A]ssuming palintiffs can show at trial that any one of the activities listed in 271(a), making, using, offering for sale, selling or [exporting] happened in the U.S., they can put in evidence about damages based on use abroad."); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1306 (Fed. Cir. 2015) ("Where a physical product is being employed to measure damages for the infringing use of patented methods, we conclude, territoriality is satisfied when and only when any one of those domestic actions for that unit (e.g., sale) is proved to be present, even if others of the listed activities for that unit (e.g., making, using) take place abroad."); *see also* Section II.B, supra ("The United States' patent law gives the owner of a valid patent the right to exclude others from importing, making, using, offering to sell, or selling the patented product or method in the United States during the term of the patent.").]

QIAGEN objects to the inclusion of this instruction. The panel decision in *Carnegie Mellon University v. Marvell Technology Group, Ltd.*, 807 F.3d 1283 (Fed. Cir. 2015), on which Plaintiffs rely, did not overturn existing authority, including the en banc decision *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1364 (Fed. Cir. 2009), which establish that it is impossible to manufacture or sell a method. *See also, Microsoft Corp. v. AT &T Corp.*, 550 U.S. 437 (2007); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, 711 F.3d 1348 (Fed, Cir. 2013); 35 U.S.C. § 284; *Meyer Intellectual Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1371 (Fed. Cir. 2012); *Cardiac Pacemakers, Inc. v. St Jude Med., Inc.* 576 F.3d 1348, 1364 (Fed. Cir. 2009) (en banc); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299 (Fed. Cir. 2006); *NTP, Inc. v. Rsch. In Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005); *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306 (Fed. Cir. 2003); *Joy Techs. Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993); *Standard Havens Products, Inc. v. Gencor Indus. Inc.*, 953 F.2d 1360 (Fed. Cir. 1991); *Abbott Cardiovascular Sys., Inc. v. Edwards Lifesciences Corp.*, C.A. No. 19-149-MN, 2019 WL 2521305, at \*18 (D. Del. June 6, 2019).

**B.      DAMAGES – KINDS OF DAMAGES**

There are several kinds of damages that are available for patent infringement.

One kind of damages is lost profits, that is, the additional profits that the patentee would have made if the defendant had not infringed.  You may hear this referred to as the "but for" test—which means, "What profits would the patent owner have made 'but for' the alleged infringement?"

Another kind of patent damages is a reasonable royalty.  A reasonable royalty is the amount that someone wanting to use the patented invention would have agreed to pay to the patent owner and that the patent owner would have accepted.  A reasonable royalty is the minimum amount of damages that a patent owner can receive for an infringement.

### C. LOST PROFITS – "BUT FOR" TEST

The Plaintiffs are seeking lost profits damages in this case in connection with QIAGEN's sales of RNA-related products.

To prove lost profits, the Plaintiffs must show a causal relationship between the infringement and Archer's loss of profit. In other words, the Plaintiffs must show that, but for QIAGEN's infringement, there is a reasonable probability that Archer would have earned additional profits for the sale of its products. In this case, Plaintiffs are only alleging lost profit damages related to lost sales of its RNA-related products as a result of QIAGEN selling RNA products that allegedly practice the claimed methods. The Plaintiffs must prove this by a preponderance of the evidence, more likely than not. Part of your job is to determine what the parties who purchased the allegedly infringing product from QIAGEN would have done if the alleged infringement had not occurred. It is important to remember that the profits I have been referring to are the profits allegedly lost by Plaintiffs, not the profits, if any, made by QIAGEN on the allegedly infringing sales.

The Plaintiffs have proven lost profits if you find that the Plaintiffs have proven each of the following factors by the more likely than not standard:

(1)     There was a demand for the patented product.

(2)     There was no available, acceptable, noninfringing substitute products.

(3)     Archer had the manufacturing and marketing capacity to make any infringing sales actually made by Defendants and for which the Plaintiffs seeks an award of lost profits – in other words, that Archer was capable of satisfying the demand.

(4)     The amount of profit that Archer would have made if it were not for QIAGEN's infringement.

### D.       LOST PROFITS – DEMAND

The first factor asks whether there was demand for the patented product in the relevant market. The Plaintiffs can prove demand for the patented product by showing significant sales of Archer's own patented products.  The Plaintiffs also can prove demand for the patented product by showing significant sales of QIAGEN's product that are covered by one or more of the asserted claims of the '810 patent and/or '597 patent.  To use sales of QIAGEN's product as proof of this demand, however, Archer's and QIAGEN's products must be sufficiently similar to compete against each other in the same market or market segment.

### E.     LOST PROFITS – NON-INFRINGING SUBSTITUTES- ACCEPTABLE NON-INFRINGING SUBSTITUTE PRODUCTS

The second factor asks whether non-infringing, acceptable substitutes for Archer's product competed with QIAGEN's infringing product in the marketplace and the impact of such substitutes on the marketplace absent the sale of QIAGEN's products.  [**QIAGEN's proposal:** If the realities of the marketplace are that competitors other than Archer would likely have captured some or all of the sales made by QIAGEN, even despite a difference in the products, then Archer is not entitled to lost profits on those sales.][25]

To be an "acceptable, noninfringing substitute," a product must have the advantages of the patented invention that were important to people who purchased the infringing products.  If purchasers of QIAGEN's products were motivated to buy that product because of features only available from that product and Archer's patented product, then some other, alternative product is not an acceptable substitute, even if it otherwise competed with Archer's and QIAGEN's products.  On the other hand, if the realities of the marketplace are that competitors other than Archer would likely have captured the sales made by QIAGEN, despite a difference in the products, then the Plaintiffs are not entitled to lost profits on those sales.

**[[QIAGEN's proposal:**  Even if you find that Archer's and QIAGEN's products were the only ones with the advantages of the patented invention, Archer is nonetheless required to prove to you that Archer, in fact, would have made QIAGEN's infringing sales.**]]**[26]

---

[25] QIAGEN's Source: AIPLA model instructions §10.2.1.4 (p. 62).
Plaintiffs' position is that this addition is argumentative and unnecessary. *See, e.g.,* Final Jury Instructions, *TrustID v. Next Caller, Inc.* No. 18-172 (MN), D.I. 285 (Jul 16, 2021).

[26] QIAGEN's Source: AIPLA model instructions §10.2.1.4 (2019) (p. 62-63).
Plaintiffs' position is that this addition is argumentative and unnecessary. *See, e.g.,* Final Jury Instructions, *TrustID v. Next Caller, Inc.* No. 18-172 (MN), D.I. 285 (Jul 16, 2021).

### F.   LOST PROFITS – NONINFRINGING SUBSTITUTES – AVAILABILITY

An alternative product may be considered "available" as a potential substitute even if the product was not actually on sale during the infringement period.  Factors suggesting the alternative was available include whether the material, experience, and know-how for the alleged substitute were readily available at the time of infringement.  Factors suggesting the alternative was not available include whether the material was of such high cost as to render the alternative unavailable and whether an alleged infringer had to design or invent around the patented technology to develop an alleged substitute.

## G.   LOST PROFITS –CAPACITY

The third factor asks whether Archer had the manufacturing and marketing ability to actually make the sales it allegedly lost due to QIAGEN's infringement.  Archer must prove that it could have supplied the additional products needed to make the sales Archer said it lost, or that someone working with Archer could have supplied the additional products. Archer also must prove that it more likely than not had the ability to market and sell these additional products.

### H.     LOST PROFITS – AMOUNT OF PROFIT

Archer may calculate the amount of its lost profits by calculating its lost sales and subtracting from that amount any additional costs or expenses that Archer would have had to pay to make the lost sales. The amount of lost profits cannot be speculative, but it need not be proven with unerring certainty.

## I.     LOST PROFITS – MARKET SHARE

If you find that there were acceptable non-infringing substitutes in the market, then Archer may be entitled to lost profits on a portion of Qiagen's infringing sales.  The burden is on the Plaintiffs to prove that it is more likely than not that Archer's product competed in the same market as QIAGEN's infringing product, and that Archer would have made a portion of the infringing sales equal to at least Archer's share of that market but for QIAGEN's infringement.  It is not necessary for the Plaintiffs to prove that Archer and QIAGEN were the only two suppliers in the market for Plaintiffs to demonstrate entitlement to lost profits.

### J.        REASONABLE ROYALTY

In this case, the Plaintiffs are also seeking damages in the amount of a reasonable royalty on QIAGEN's DNA-related products.  In addition to considering the issue of a reasonable royalty on the DNA-related products, if you find that the Plaintiffs have not proven their claim for lost profits concerning the RNA-related products, or if you find that the Plaintiffs have proven their claim for lost profits for only a portion of the infringing sales, then you must also consider the issue of a reasonable royalty for products for which the Plaintiffs sought, but were not awarded, lost profits damages.

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.  A reasonable royalty is the royalty payment that would have resulted from a hypothetical negotiation between the patent owner and the alleged infringer just before the infringement began.  In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the infringer would have been if they had entered into an agreement at that time, and if they had acted reasonably in their negotiations.  In determining this, you must assume that both parties to the hypothetical negotiation believed the patent was valid and infringed and that both parties were willing to enter into an agreement.   The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a  royalty either party would have preferred.

Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.  Although evidence of the actual profits an alleged infringer made may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer made.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. No one fact is dispositive and you should consider

the evidence that has been presented to you in this case. You may also consider any other factors that in your mind would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people.

### K.     REASONABLE ROYALTY – RELEVANT FACTORS TO THE HYPOTHETICAL NEGOTIATION

In determining the amount of a reasonable royalty, you may consider evidence on any of the following factors.  This is not every possible factor, but it will give you an idea of the kinds of things to consider in setting a reasonable royalty.

1.   Any royalties received by the licensor for the licensing of the Asserted Patents, proving or tending to prove an established royalty.

2.   The rates paid by QIAGEN to license other patents comparable to the Asserted Patents.

3.   The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of its territory or with respect to whom the manufactured product may be sold.

4.   The licensor's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention, or by granting licenses under special conditions designed to preserve that exclusivity.

5.   The commercial relationship between the licensor and the licensee, such as whether or not they are competitors in the same territory in the same line of business.

6.   The effect of selling the patented product in promoting other sales of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such collateral sales.

7.   The duration of the Asserted Patents and the term of the license.

8.   The established profitability of the product made under the Asserted Patents; its commercial success; and its popularity.

9. The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by or for the licensor; and the benefits to those who have used the invention.

11. The extent to which QIAGEN has made use of the invention; and any evidence that shows the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the profit that arises from the patented invention itself as opposed to profit arising from unpatented features, such as the manufacturing process, business risks, or significant features or improvements added by the accused infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor and a licensee (such as QIAGEN would) have agreed upon (at the time the infringement began) if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention— would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a patentee who was willing to grant a license.

16. Any other economic factor that a normally prudent business person would, under similar circumstances, take into consideration in negotiating the hypothetical license.

No one factor is dispositive, and you can and should consider the evidence that has been presented to you in this case on each of the factors. You may also consider any other factors that in your mind would have increased or decreased the royalty the infringer would have been willing to pay, and the patent holder would have been willing to accept, acting as normally prudent business people.

## L.      REASONABLE ROYALTY – ATTRIBUTION / APPORTIONMENT

The amount you find as damages must be based on the value attributable to the patented technology, as distinct from other, unpatented features of the accused product, or other factors such as marketing or advertising, or QIAGEN's size or market position.  In determining the appropriate royalty base and the appropriate royalty rate, the ultimate combination of both the royalty rate and the royalty base must reflect the value attributable to the patented technology. In other words, the royalty base must be closely tied to the invention.  It is not sufficient to use a royalty base that is too high and then adjust the damages downward by applying a lower royalty rate.  Similarly, it is not appropriate to select a royalty base that is too low and then adjust it upward by applying a higher royalty rate. Rather, you must determine an appropriate royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention alone.

## M.     REASONABLE ROYALTY – TIMING

Damages are not based on a hindsight evaluation of what happened, but on what the parties to the hypothetical license negotiations would have agreed upon.  Nevertheless, evidence relevant to the negotiation is not necessarily limited to facts that occurred on or before the date of the hypothetical negotiation.  You may also consider information the parties would have foreseen or estimated during the hypothetical negotiation, which may under certain circumstances include evidence of usage after infringement started, license agreements entered into by the parties shortly after the date of the hypothetical negotiation, profits earned by the infringer, and non-infringing alternatives.

**N.     REASONABLE ROYALTY – AVAILABILITY OF NON-INFRINGING SUBSTITUTES**

In determining a reasonable royalty, you may also consider evidence concerning the availability and cost of acceptable non-infringing substitutes to the patented invention. An acceptable substitute must be a product that is licensed under the patent or that does not infringe the patent.

### O. REASONABLE ROYALTY – USE OF COMPARABLE LICENSE AGREEMENTS

When determining a reasonable royalty, you may consider evidence concerning the amounts that have been paid for rights to similar technologies.  A license agreement need not be perfectly comparable to a hypothetical license that would be negotiated between the Plaintiffs and the Defendants in order for you to consider it.  However, if you choose to rely upon evidence from any other license agreements, you must account for any differences between those licenses and the hypothetically-negotiated license between the Plaintiffs and the Defendants, in terms of the technologies and economic circumstances of the contracting parties, when you make your reasonable royalty determination.

## IV.    DELIBERATIONS AND VERDICT

### A.    DELIBERATION AND VERDICT – INTRODUCTION

Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take me some time to get back to you. Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is Juror No. 1.

One more thing about messages. Do not ever write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be. That should stay secret until you are finished.

### B.      UNANIMOUS VERDICT

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so consistent with your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict. Remember at all times that you are not partisans. You are judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you. I will review that document with you in a minute.

You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form. You will then return to the courtroom and my deputy will read aloud your verdict.

## C.    DUTY TO DELIBERATE

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that—your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So, you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.

**D.     COURT HAS NO OPINION**

Let me finish up by repeating something that I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourselves based on the evidence presented.